Morris Canal and Banking Co. *v.* Central Railroad Co. et al.

1. To entitle a party to an injunction, his title to the property and rights claimed by him, and for the protection of which he asks the interposition of the court, must appear in a clear and satisfactory manner.

2. The making and filing of the survey required by the 5th section of the act incorporating the " Morris Canal and Banking Company," (*Pamph. L.*, 1824, *p.* 160,) is a necessary prerequisite to the taking of any lands under the powers given by the charter.

3. It is an established rule in the exposition of statutes, that the intention of the legislature is to be derived from a view of the whole, and of every part of the statute taken and compared together. The real intention, when ascertained, will prevail over the literal sense of terms. When words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the remedy in view; and the intention is to be taken or presumed, according to what is consonant to reason and good discretion.

4. As a rule of construction, the legislature ought to be considered as intending to grant, by a charter of incorporation, such powers only as are necessary or useful to the end or object which they had in view in creating the corporation. They ought not to be understood as granting anything more, unless the intention to do so is plainly expressed, or beyond a doubt.

5. In public grants the grantee can take nothing not clearly given him, by the grant. In cases of doubt, the grant is construed in favor of the state and most strongly against the grantee.

6. The third section of the " act to incorporate the Associates of the Jersey Company," (*Pamph L.*, 1804, *p.* 370,) enacts as follows : " That the said Associates shall have the privilege of erecting or building any docks, wharves, and piers, opposite to, and adjoining the said premises in Hudson river, and the bays thereof, as far as they may deem it necessary for the improvement of the said premises, or the benefit of commerce, and to appropriate the same to their own use." *Held,* that this section merely gave the Associates a privilege or license to build docks, wharves, and piers, in the

waters of the Hudson river, and the bays aforesaid, in the manner therein mentioned, and when so built, to appropriate them to their own use, and conferred upon them no power to transfer or convey such privilege or license to any other corporation. *Held further*, that the land not so occupied and built upon was not granted to the Associates, and that the same and all rights in and over it remain in the state as before.

7. This court will not interpose by injunction to prevent an apprehended injury, which is not irreparable, and which is capable of compensation in damages.

8. An injunction should only be issued in cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. The right must be clear, and the injury be impending or threatened, so as to be averted only by the protecting, preventive process of injunction.

Upon the filing of the bill in this cause, an order was made that the defendants show cause why an injunction should not issue according to the prayer of the bill, and granting a temporary injunction in the meantime. The defendants filed their answers, and affidavits were taken, under an order of the court, to be read upon the argument of the rule to show cause. The cause was heard, by direction of the Chancellor, before James Wilson, esquire, one of the masters of the court, upon the rule, upon the bill, answers, and affidavits.

*I. W. Scudder* and *Zabriskie*, for complainants.

*Browning* and *Williamson*, for defendants.

THE MASTER. The complainants, by their bill, set forth that under their charter and the supplements thereto, they constructed their canal from the waters of the Delaware to the waters of the Hudson, and that, in its easternmost section, it crosses the Hackensack river and Mill creek, and that the same are navigable streams. That the canal, from the Hackensack on the west to the Hudson on the east, is fed or supplied with water by the tide waters of New York bay, at a place called Fiddler's Elbow, and by the tide waters which flow up from Hudson river or New York bay into Mill creek, and also by the tide waters of Hudson river, where the canal terminates. That said easternmost section has not, since its

construction, had any other feeders than the tide waters of the Hackensack, the tide waters of New York bay at Fiddler's Elbow, the tide waters of Mill creek, and the tide waters of the Hudson; and that all of said feeders are essential to the navigation of the canal in its easternmost section. That Mill creek, in its main course, runs in a southerly direction, and empties into Hudson river or Communipaw bay, and is crossed by the canal, about four hundred and fifty yards from its mouth, and that the creek is navigable from its mouth to the place where it is crossed by the canal. That the complainants have made an outlet in the canal at Mill creek, and the same has been used to pass boats to and from the Hudson. That between Beach and Henderson streets, in Jersey City, there is a space of about five hundred and fifty feet, where the southerly bank of the canal is washed by the tide waters of Communipaw bay, and where boats carrying freight on the canal can discharge their cargoes, and from which bank such cargoes can be re-shipped into vessels navigating said river or bay. That the complainants have the right of navigation to and from the bank of their canal, between Beach and Henderson streets, to the open waters of Hudson river, and that they have title to lands under water between said streets and south of their canal, as far south as South street, which is also under water. That they are riparian owners for the space of about five hundred and fifty feet between Beach and Henderson streets, and thereby have access to the Hudson river and the bays thereof. That from the line of Henderson street to the old boundary ditch of the Associates of the Jersey Company, a distance of about nine hundred feet, the canal was constructed in the waters of Hudson river and Communipaw bay, and that its embankment is now washed by the said waters at low tide. That the complainants own in fee the lands and lands under water, lying northerly of and next adjoining to said canal, and between Henderson street on the west, and the easterly side of said ditch, including lands in that space lying

upon and along the original high water line of Communipaw bay. And the conveyances or muniments of title under which the complainants claim the property and rights aforesaid, are stated or referred to in the bill.

The bill further states, that within the present limits of Jersey City is a tract of land formerly called Powles' Hook, which was formerly owned by " The Associates of the Jersey Company," and that said Associates had, by their charter, a right of property in the lands under water adjoining Powles' Hook, in the Hudson river, Communipaw bay, and Harsimus bay, and a right to build docks, wharves, and piers, opposite to and adjoining said premises, and that they conveyed all their said lands under water, and their said right, to the complainants, by deeds and conveyances mentioned in the bill. That finding that they needed further dock or basin room for the accommodation of their business, the complainants constructed, between the month of October, 1859, and the month of October, 1860, a dock or basin on the lands under water so by them acquired of said Associates. That said basin was constructed on the southerly side of Jersey City and adjoining the same, and in the waters of Hudson river or Communipaw bay, by sinking crib-work filled with stone and earth; said basin being about nine hundred feet in width and about eighteen hundred and fifty feet long on the easterly side, and about sixteen hundred and fifty feet long on the westerly side. That they constructed the same under the titles acquired in the manner stated in their bill, and under the powers given by their charter and the supplements thereto, and under the express authority given by the said Associates, and lawfully transferred to the complainants.

The bill further states, that the Central Railroad of New Jersey have located the route of a railroad which they intend to construct, and that said route in its course enters Communipaw bay, and extends through the waters thereof, and crosses the southern part of said basin, and that the company have commenced making, and intend to complete,

in the said waters on the line of said route, a solid embankment or bulkhead, and that the execution of the plan of the railroad company will destroy the basin of the complainants, and will destroy Mill creek as a feeder, will deprive the complainants of their rights as riparian owners, will shut off all navigation within the northerly part of Communipaw bay, render access to a large portion of the bank of their canal impossible, and will work irreparable injury to the complainants. That the railroad company claim that they are authorized to construct their road and said embankment under a supplement to their charter, whereas the complainants insist that said supplement gives said company power to construct the same only to the said bay and no further, and does not authorize them to construct said embankment in the waters of the bay. That the railroad company deny the complainants' right to the basin, and are about to occupy a part of it as aforesaid, and destroy their other rights without making them compensation, and that they and the Mayor and Common Council of Jersey City are corruptly combining to injure the complainants by the means before stated.

An injunction is, therefore, prayed for, to restrain the defendants from constructing said embankment or bulkhead, or doing any other injury to said basin, and the complainants' said other property and rights.

The answer of the railroad company admits the existence of some, but not all the deeds and conveyances set forth by the bill, but denies that they have the effect claimed in the bill, and denies that the feeder at Mill creek is essential to the canal, and states that the outlet from the canal to the creek has been but very lately constructed, and is of little value, and was constructed only to make out a case against the defendants, to obtain an injunction ; and also that the complainants have a steam pump at the Hackensack river, which furnishes an important part of the water to the canal.

The answer also denies some of the rights claimed by the bill, west of the old boundary ditch, and also denies that the complainants had any right to construct said basin, and

charges that the same is a great obstruction to navigation, and is a nuisance and ought to be abated.

The answer further states, that the railroad company are the owners of a railroad extending from Phillipsburg to Elizabethtown Point, in the construction of which about six millions of dollars have been expended. That it is one of the main avenues for the transportation of coal from the mines of Pennsylvania, and of other merchandise to New York, and also one of the main avenues of trade between New York and the south and west. That, by a supplement to their charter, they are authorized to extend their road from Elizabeth City to New York bay, at some point at or south of Jersey City, and that, for the purpose of making such extension, they have purchased the right of way across the main land, and have also purchased, to a large extent, the rights of shore owners upon Communipaw bay. That, having filed a survey of their route, they commenced nearly a year ago to bridge Newark bay, and that they have expended a very large sum of money upon their extension. That in the purchase of the rights of the shore owners upon Communipaw bay alone, they have expended the sum of one hundred and eighty thousand dollars. And that the temporary injunction granted in this cause has already most injuriously interrupted their business operations, and interfered with and deranged their contracts with other companies, and with persons who had undertaken the construction of their road.

The answer admits that the defendants intend to construct a solid embankment in the waters of Communipaw bay, and insists that, under the supplement to their charter authorizing the extension of their road, they have the right to do so. They insist that the basin of the complainants, being a nuisance, ought to be abated, and that, if the crib-work which forms the enclosure is removed, there will be a free and open navigation from Communipaw bay to the Hudson river.

The charges in the bill of a design to speculate are denied, both by the company and by John Taylor Johnston, their

president, who joined in their answer. The charges of combination with the Mayor and Common Council of Jersey City are also denied.

The Mayor and Common Council have also filed an answer, denying the combination between them and the railroad company, charged in the bill.

Upon the filing of the bill, an order was made that the defendants show cause why an injunction should not issue, according to the prayer of the bill, and granting a temporary injunction in the meantime. The defendants filed their answers, and, under an order made for the purpose, affidavits were taken by the parties, to be read upon the argument of the rule to show cause. The parties, by their respective pleadings and the affidavits so taken, and through the arguments of counsel, have had full opportunity to lay their rights and claims before the court. Upon the matters thus presented, the question, whether a permanent injunction should be granted against the defendants, or not, is now to be considered and decided.

In order to entitle the complainants to the injunction which they seek, it is necessary that their title to the property and rights claimed by them, and for the protection of which they ask the interposition of this court, should be made to appear in a clear and satisfactory manner. This is an established rule in applications of this nature.

In the case of *Outcalt* v. *Disborough*, 2 *Green's Ch. R.* 216–17, Chancellor Vroom says : " It is a general rule that the party seeking to be protected in the possession or enjoyment of real property, must show a right, and it must be such a right as the court will feel bound to protect, upon his own showing, against the act of the defendant." And he cites *Field* v. *Jackson*, 2 *Dick.* 599, and *Whitelegg* v. *Whitelegg*, 1 *Bro. C. C.* 57, in support of this doctrine. I refer further upon this point to *Storm* v. *Mann*, 4 *Johns. Ch. R.* 21 ; *Nevitt* v. *Gillespie*, 1 *Howard (Mississippi) R.* 113 ; *Price* v. *Methodist Church*, 4 *Hammond* 547 ; *Davis* v. *Leo*, 6 *Vesey* 784–7 ;

2 N*

*Smith* v. *Collyer*, 8 *Vesey* 89 ; *Mayor of Jersey City* v. *Morris Canal and Banking Co.*, 1 *Beas.* 551.

The large basin described in the bill, is an important part of the property claimed by the complainants, and I will consider first the questions arising upon this part of the case.

This basin is constructed in the navigable waters of the Hudson river and Communipaw bay, and is wholly below low water mark. It was built by the complainants between the month of October, 1859, and the month of October, 1860, as stated in their bill. They also state that they constructed it under the titles acquired in the manner set forth in the bill, and " under the powers given by their charter, and the supplements thereto, and under the express authority given by the Associates of the Jersey Company, and lawfully transferred to the complainants."

Let us, then, inquire what are the powers given by the complainants' charter and the supplements thereto, for this purpose. By the fifth section of the charter, they are authorized to construct a canal or artificial navigation to connect the waters of the Delaware with the waters of the Passaic, " with all the locks, works, devices, wharves, toll-houses, and offices, necessary for the use of the said canal." And also by themselves and their agents to enter upon and survey all lands, for the purpose of surveying the route of their canal, and locating the several works above specified. And it is declared by the same section, that when the said route " shall have been fixed upon, and its several works located by the president and directors, or a majority of them, and a survey thereof deposited in the office of the secretary of state, then it may be lawful for them and for any agent, superintendent, engineer, contractor, or any person or persons employed in the service of said corporation, at any time to enter upon, take possession of, and use all and singular such lands, water, and streams, subject to such compensation to be made therefor, as is hereafter directed."

The supplement of 28th January, 1828, authorized the company to extend their canal to the Hudson, but does not

give any further powers for the purposes above stated, than those mentioned in the fifth section of the charter.

It is stated in the answer, and upon the argument was admitted by the complainants' counsel, that no survey of the place where the basin is constructed was ever made or deposited in the office of the secretary of state, in conformity with the requirements of this section. The making and filing of such survey is a necessary prerequisite to the taking of any lands under the powers given by their charter. *Bonaparte* v. *Camden and Amboy R. R. Co.*, *Baldwin's R.* 205; *Doughty* v. *Somerville and Easton R. R. Co.*, 1 *Zab.* 442.

I did not understand the complainants' counsel to deny the correctness of this position. The complainants, therefore, not having filed the required survey, could not lawfully construct this basin by virtue of their charter, if they acted under that alone, and without further authority and right.

But they insist that they had further authority and right. They say that docks or basins are comprised in the "works and devices" which, by their charter, they are authorized to make, and that under and by virtue of the conveyances from "The Associates of the Jersey Company," set forth in their bill, they, the complainants, became the owners in fee of the lands under water, now occupied and enclosed by this basin; or that, if said conveyances did not convey the fee in said lands, they transferred to the complainants a right and authority to construct docks, wharves, and piers, in said waters, and that, by virtue of the title or right so derived from the associates, in connection with the powers given by their charter, as aforesaid, they had full power to construct said basin, and appropriate it to their own use. The title or right which it is contended the Associates thus transferred to the complainants, it is insisted the Associates had and held, under and by virtue of their charter. They were incorporated by an act of the legislature, passed 10th November, 1804. It will be necessary, therefore, now to examine that statute, in order to see what rights it gave to the Associates.

428            CASES IN CHANCERY.

" It is an established rule in the exposition of statutes,"
says Chancellor Kent, " that the intention of the legislature
is to be derived from a view of the whole, and of every part
of a statute, taken and compared together. The real inten-
tion, when ascertained, will prevail over the literal sense of
terms.  *  *  *  *  When words are not explicit, the in-
tention is to be collected from the context, from the occasion
and necessity of the law, from the mischief felt, and the
remedy in view ; and the intention is to be taken or presumed
according to what is consonant to reason and good discre-
tion."  1 *Kent's Com.* 461–2.

Chief Justice Marshall, in speaking of the proper means
of arriving at the true meaning of a statute, says : " Where
the mind labors to discover the design of the legislature, it
seizes everything from which aid can be derived, and in such
case, *the title* claims a degree of notice, and will have its due
share of consideration."  *United States* v. *Fisher*, 2 *Cranch*
386.

The title of this act is " an act to incorporate the Associates
of the Jersey Company."

In the preamble it is set forth, that it has been represented
to the legislature, that Richard Varick and others have be-
come proprietors, by purchase from Cornelius Van Vorst, of
a certain tract of land and premises therein described, called
Powles' Hook, with a ferry right, and that they had divided
it into one thousand shares, and that they had, by agreement,
associated and become associates with divers other persons
in said shares, and that said associates had petitioned the
legislature for an act of incorporation.

By the first section, the said Richard Varick, and the said
other persons interested with him in said shares, are consti-
tuted a body corporate, with powers to sue, &c., and are de-
clared to be capable, by their corporate name, to have and
hold lands, tenements, and hereditaments. But it is expressly
provided and declared, in and by said section, that the lands,
tenements, and hereditaments which it should be lawful for
the said corporation to hold, should *only* be the said tract of

land and premises, with the privileges and appurtenances in said act before described, and such other lands as they might take in payment or security for debts.

The second section gives the said corporation " power to lay out streets and squares on said tract, and to establish such as had already been laid out, and to regulate the same, and to direct and govern the leveling, pitching, and constructing of the said streets, and the raising and leveling of all lots and grounds for buildings, as well public as private, and to order and regulate the building of all docks, piers, and wharves, and all store-houses and buildings thereon, and to make by-laws, ordinances, and regulations, touching all the said matters, and to enforce the same by penalty." But the powers conferred by this section, it is declared, shall cease whenever the legislature shall institute another corporation for those purposes.

The third section enacts as follows: " That the said Associates shall have the privilege of erecting or building any docks, wharves, and piers, opposite to and adjoining the said premises in Hudson river and the bays thereof, as far as they may deem it necessary for the improvement of the said premises, or the benefit of commerce, and to appropriate the same to their own use."

The eighth section directs that the clerk of Bergen county shall appoint a deputy, who shall be sworn as such, and reside and keep an office within the district of country formerly known by the name of the Island of Harsimus, and which includes Powles' Hook, who shall keep proper books for the recording of all deeds, mortgages, and writings which might thereafter be made or executed, relating to real estate within said district.

The tenth section declares that all sales at auction, to be made at Powles' Hook and the said island of Harsimus, shall be free from any duty imposed by this state, for the period of fourteen years from the passing of said act. These are the parts of the act which relate more particularly to the object of our present inquiry.

We see, therefore, from these provisions, that the persons named in the act are incorporated by it, and that the tract of land and premises, to wit, Powles' Hook, which they before held and owned as individuals, they are made capable of holding and owning as a body corporate; and that they are not permitted to hold any other lands, except such as they might take in payment or security for debts; and that they are empowered to exercise, for a limited time only, the municipal powers mentioned in the second section. We see, also, that certain privileges and benefits are, by the eighth and tenth sections, secured to the inhabitants of Powles' Hook, and are extended to their neighbors upon other parts of the island of Harsimus.

The object and intention of the legislature in passing this act, so far as they can be gathered from the act itself, seem to have been to enable the corporation thereby created, to lay out and improve the said tract known as Powles' Hook, and prepare the same for settlement as a town or city, and to invite and encourage persons to settle and build there. And the powers granted seem to be limited so as to apply to that place only, and to be used for that purpose and no other. The corporation is authorized to hold that tract, and no other land, save such as they might take in payment or security for debts. The powers granted by the second section are to be exercised in and over that place, and no other, and are to cease upon the happening of the event named. The privilege granted by the third section, to build docks, wharves, and piers in the waters there named, specifies that they may be built as far out as the said Associates may deem necessary for *the improvement of said premises,* or the benefit of commerce. The object and intention of the legislature, as thus understood, in passing this act, should be borne in mind and have their due influence, in examining the different parts of the act to ascertain their true meaning.

It is insisted by the complainants, that by the third section, the fee simple in all the lands under water in Hudson river, Communipaw bay, and Harsimus bay, opposite to and

adjoining Powles' Hook, as far out as the right of the state extended, was granted to the Associates, or that the right to build docks, wharves, and piers in the waters of said river and bays was thereby granted, and that such right was an incorporeal hereditament in gross, and that the Associates had a right to convey, and did convey such fee simple or right to the complainants.

On the part of the defendants, it is insisted that the privilege granted by the said third section to the Associates, was only a privilege or license to build said docks, wharves, and piers, and appropriate them to their own use, and that they could not convey or transfer the said privilege to the complainants or to any other corporation.

When we take into consideration the extent and value of those lands under water, their situation in relation to our own state and to the city of New York, with its extensive and valuable trade and commerce, and forming, as those waters do, an important part of the harbor of New York, the best, not only in this country but upon this continent, it is most reasonable to conclude that, if the legislature intended to grant and convey the fee in said lands, or such right over them as is contended for by the complainants, that their intention would be made plainly to appear, and that the grant itself would be made in clear, direct, and explicit terms.

What has been done in other cases of grant of lands by legislative act in this state?

It is said by Judge Elmer, in the case of *Bell* v. *Gough*, 3 *Zab.* 667, that "but three cases of distinct grants of land covered with water, or of the shore, by the legislature, are to be found in our statute books," referring to the grant of the Pea Patch to Henry Gale, by the act of 24th November, 1831, *Pamph. L.* 15; the grant to Nathaniel Budd, by act of 8th November, 1836, *Pamph. L.* 13; and the grant to Aaron Ogden, by act of 25th January, 1837, *Pamph. L.* 64.

In the Pea Patch grant, the language of the act is, that "all the right and title of the said state of New Jersey to the said island called the Pea Patch, with all and singular the

appurtenances, be and the same are hereby granted and conveyed to the said Henry Gale, his heirs and assigns forever; and that the same shall forever hereafter be vested in the said Henry Gale, his heirs and assigns, in as full and ample a manner as the state of New Jersey hath right and title to grant the same," reserving, however, the state's right of jurisdiction and sovereignty. The language in the grant to Budd is the same, and in that to Ogden is equally clear.

The language used in these three acts, leaves no doubt in regard to the intention of the legislature, or the nature and extent of the estate granted. Compare this with the language of the third section of the charter of the Associates. The difference is striking. The grant of the Pea Patch declares that "*all the right and title*" of the state to the same, "*are hereby granted and conveyed to the said Henry Gale, his heirs and assigns forever, and that the same shall forever hereafter be vested in the said Henry Gale, his heirs and assigns,*" &c.

The third section of the Associates' charter declares that "*they shall have the privilege to build docks, wharves, and piers,*" &c., and "*to appropriate the same to their own use.*" The words " grant," " convey," " right," " title," " estate," are none of them found in it. Not only is the language of this third section different from that used in those grants, but it is also wholly unlike that uniformly used in a deed intended to convey a fee simple, or such right as the complainants are contending for. No discreet conveyancer would use such language in such a deed. It would not be deemed either apt or adequate for the purpose. And when a grant of an estate in fee, in lands so extensive and valuable, or a grant of so important a right over them as is argued for by the complainants, is intended to be made by the state, by means of an act of the legislature, passed with all the formalities and deliberation attendant upon legislation, is it not reasonable to suppose that they would employ language at least as plain, explicit, and direct, as that which is deemed

appropriate and necessary in an ordinary deed between individuals?

Again: This third section declares that the Associates shall have the privilege of building docks, wharves, and piers in those waters, and to appropriate the same, that is, the docks, wharves, and piers, to their own use. Can this properly be said to grant *all* those lands under water upon which the Associates did *not* build any dock, wharf, or pier? If it was intended by the legislature to grant *the whole* of those lands, or a right for ever over *the whole* of them, whether so built upon or not, why was this section so framed and expressed as to declare in effect, that when they built a dock, wharf, or pier upon any particular *part* or *portion*, they might appropriate the same to their own use? Is the giving of a privilege to occupy and build upon, and then to appropriate *a part* of certain lands, a *grant* or *conveyance* of the *whole* of those lands? Does not this section, by giving to the Associates a privilege of building and appropriating to their own use, docks, wharves, and piers, which must of necessity be built upon *parts* and *portions* of those lands under water, selected from time to time, exclude the idea that the legislature meant to grant *the whole* of said lands? Is it not really an indirect declaration, that the land not so occupied and built upon was *not* granted, and that the same, and all right in it, and over it, remained in the state as before?

Would such construction of this section as is contended for by the complainants, be in accordance with the intention of the legislature in passing this act, or in harmony with the other parts of the act? It seems to have been intended to restrict the powers of the Associates within narrow limits. They are incorporated by the first section, and enabled to hold lands, &c. The powers given by the second section were to last but for a time, and when they ceased, little else but the power to hold Powles' Hook and improve it, remained in the Associates, except what is given by the third section. The first section, moreover, expressly provides that

the lands, tenements, and hereditaments which they should be capable of holding, should be *only* those therein before described. Would the legislature, after thus restricting the powers of this corporation, and after expressly declaring that they should not be capable of holding any other lands, tenements, or hereditaments than those mentioned in the first section, proceed at once in the third section to grant to them those extensive and valuable lands under water in fee simple, or such incorporeal hereditament in or over them as is contended for by the complainants? The two sections as thus construed would conflict with each other.

Again: The privilege given by the third section to the Associates, is to build docks, &c., in those waters, as far out as *they* may deem necessary for the improvement of the said premises, or the benefit of commerce. Here it is left *to them* to judge and decide in this matter. They were the owners of Powles' Hook, and as such were incorporated with powers to hold and improve it, with the view of building up a town. And as they, as a corporation, were to own no other lands, and could have no object or interest different from this, such right to build docks, wharves, and piers, might safely be vested in them, to be used according to their judgment. They could have no motive to use this privilege for any other purpose, and it was granted to them in furtherance of the object and intent of the act. But if the right or privilege granted by this section, were such as is contended for by the complainants, the Associates might not only use it themselves, but might sell and convey it away, or it might be sold against their will, by virtue of judgment and execution against them, and might thus pass into the hands of unfriendly individuals, or of a corporation created for other purposes, and having interests in conflict with, or hostile to the interests of the community or town of Powles' Hook. And thus what was granted by the legislature for their benefit, might be used for their injury or destruction. The legislature might well be willing to grant such a privilege to the Associates in such manner as to be used by

*them* and according to *their* judgment, for the building up of Powles' Hook and the encouragement of its trade and commerce, but unwilling to grant them an estate or right which might pass into other hands, and be used for very different and perhaps contrary purposes.

Moreover, the provisions of this third section seem not to be the main purpose of the act, but merely auxiliary thereto. I think it is right, as a rule of construction, to consider the legislature as intending by this section to grant such powers as were necessary or useful to the end or object which they had in view in creating this corporation, and that they ought not to be understood as giving or granting anything more, unless their intention to do so is declared or made known in the plainest terms, leaving no possible room for doubt. Here, if the third section is construed to give to the Associates only a *privilege* or *license* to build docks, &c., to be exercised by themselves, and not transferable, it gives all that is necessary or useful in that respect, to enable the corporation to accomplish the ends for which it was created. But if it is construed to grant a fee, or such right as the complainants contend for, it grants more than is necessary or useful for that purpose. We must therefore conclude that they did not intend to grant so much, since the language used cannot be said to have, beyond all doubt and controversy, the meaning contended for by the complainants. If the Associates had, by that section, a privilege or license to build, &c., to be used and exercised by themselves, they could build docks, wharves, and piers, as far out as they might deem necessary for the improvement of Powles' Hook, or the benefit of commerce. If they had a fee in the lands, or a right over all of them, capable of being transferred and conveyed away, they could do no more, except that they might sell such estate or right, which, so far from being a benefit to Powles' Hook, might be the means of great injury and mischief.

Again, look at the title of this act. It is "an act to incorporate the Associates of the Jersey Company." In this, brief and simple as it is, we find nothing to indicate that the

legislature intended to grant any great or unusual rights or powers.

But if, notwithstanding the considerations already mentioned, the meaning of this third section should still seem to be doubtful, there are other principles which may assist us in arriving at a correct conclusion.

It is a well settled rule of construction in regard to a public grant, that the grantee can take nothing not clearly given him by the grant. In cases of doubt, the grant is construed in favor of the state, and most strongly against the grantee. *United States* v. *Arredondo,* 6 *Peters* 738–9 ; *Charles River Bridge* v. *Warren Bridge,* 11 *Peters* 545; *State* v. *Bentley,* 3 *Zab.* 538; *Proprietors of Bridges, &c.,* v. *Hoboken Land and Improvement Co.,* 2 *Beas.* 94; *Townsend* v. *Brown,* 4 *Zab.* 87.

In this last case, Chief Justice Green says:

" It is a rule of construction, no less wise than clear, that in all cases of public grants, the interpretation shall be most favorable to the public, and most strongly against the grantee. The rule is founded in wisdom. All experience teaches that public rights are yielded to private interests with sufficient alacrity. If the legislature really design to grant to individuals the right of several fishery, below low water mark, it is easy to do so in plain and express terms. It is far better that the right should be settled by legislative interference, than that public rights should be frittered away by the aid of judicial construction."

It was further said by the counsel for the complainants, that the construction of this third section had been settled in their favor by the decisions in the cases of *Den* v. *Dummer, Spencer's R.* 86, and *The Associates* v. *Jersey City,* 4 *Halst. Ch. R.* 715, in which, as they insist, the court held that the Associates owned all this land under water, opposite to and adjoining Powles' Hook, to the middle of Hudson river, Communipaw bay, and Harsimus bay. But I do not so understand it. It was not necessary for the court to decide that question

in either of those cases, and I do not think that they have done so.

I am not able to see, either from the language of the third section of the charter of the Associates, or from the other parts of the act, or from the whole act taken and considered together, and the object and intention of the legislature in passing it, that that section has the meaning and effect contended for by the counsel of the complainants. I am of opinion that it gives to the Associates merely a privilege or license to build docks, wharves, and piers, in the waters of the Hudson river, and the bays aforesaid, in the manner there mentioned, and when so built, to appropriate them to their own use ; and that the Associates could not transfer or convey such privilege or license to any other corporation.

The complainants' counsel upon the argument, claimed further, however, that they had a right, as riparian owners, to construct this basin. I do not perceive that this is so. South street, one of the streets laid down upon Mangin's map, a map made or adopted by the Associates, and which street is one hundred feet wide, lies immediately north of the basin, and between it and the lands of the complainants. It has been decided that the streets upon Mangin's map are dedicated to public use, and that though the fee in them remained in the Associates, it was nevertheless subject to the public easement created by such dedication. *Den.* v. *Dummer, Spencer's R.* 86; *Mayor, &c., of Jersey City* v. *Morris Canal and Banking Co.,* 1 *Beas.* 547.

The complainants' counsel seemed to attach some importance to the fact, that a portion of the northerly side of South street is occupied by the pier built by the complainants upon the southerly side of their smaller basin. But according to the decision in the case just cited from 1 *Beas.* 547, the complainants did not thereby acquire any exclusive right to the part of the street so occupied. It still remained a public street, and the right of the public, and of all persons who were before entitled to use it as such, was as perfect and complete as before.

2 o *

Even if the Associates had conveyed to the complainants all their right and title in South street, and they thereby became in law riparian owners, yet an important question would still remain to be settled, as to what rights belonged to them as riparian owners, they being an incorporated company, and having only limited powers under their charter. That question came up in the case of *The State* v. *Brown*, 3 *Dutcher*, 13, and the Chief Justice, in delivering the opinion of the court, expressly declined giving an opinion upon it. It may therefore be considered at least a doubtful point. But I do not find that South street ever was conveyed to the complainants. It is not included in the bounds or description of the deed from the Associates, dated 2nd January, 1845, or that dated 13th September, 1845, as the same are stated and set forth in the bill, nor in any other conveyance which has come to my notice.

I am of opinion that the complainants have not shown any sufficient authority in themselves to construct the said basin, or that they have a good and sufficient title thereto. And that, therefore, this court upon well established principles, which regulate its practice and proceedings, ought not to grant an injunction to protect them in the enjoyment thereof.

It was urged by the counsel for the complainants, that in case the complainants' title should not be made out to the satisfaction of the court, that the temporary injunction should be allowed to stand until that question could be tried at law. In some cases, this court will hesitate to decide upon a question of title on an application for an injunction. But the proper course to be pursued, will always depend much upon the circumstances of each particular case. On the present application the title claimed by the complainants, and the grounds upon which it is believed by them to rest, have all been laid before the court, and the material facts in regard to it are not disputed. I speak now of their claim to the basin.

The injunction prayed for would suspend an important work of a public nature, and do a great and daily recurring

injury to the stockholders, whose capital to a large amount is invested in it. The court must take care, when called upon to interpose to prevent an apprehended injury to one party, not to do at least as great an injury to the other. I think that, under the circumstances of this case, it would not be just to tie up the defendants by injunction, until the question of title could be tried at law.

The other rights and property claimed by the complainants, and for which they seek protection by injunction, are the right to use the tide waters of Mill creek, for the purpose of feeding their canal by means of the feeder constructed there; also the right to use the creek as an outlet to their canal, and the right of navigating the waters of the creek and of Communipaw bay; also, the rights of adjacency to the waters of said bay, where said waters wash the bank of the canal; also, the right of riparian owners upon the shores of said bay, and the right of passing over the waters thereof, to and from their canal, and of loading and unloading boats on the banks thereof. They also claim to own lands under water between Beach and Henderson streets, under a deed from Cornelius Van Vorst. But their title to those lands is denied by the defendants, and no deed from Van Vorst was produced, nor was any evidence offered in regard to it. The complainants' counsel say that there has been such a deed, but that it is now lost.

The canal company were, by their charter, authorized to construct their canal from the Delaware to the Passaic. By a supplement passed twenty-eighth January, 1828, they were empowered to extend it to the Hudson. This extension was constructed in the year 1836, as appears by the bill, and it crosses the Hackensack river and Mill creek. Mr. Talcott, who now is, and since the spring of 1846 has been, chief engineer of the canal company, says, that when he first took charge of the canal, the structure upon which the canal had before crossed Mill creek was washed away. That afterwards new fixtures were made for the purpose, under his superintendence and direction, and in describing them, he says that "they

consisted of a plain wooden syphon culvert, with an embankment on each side of the canal, over it, entirely excluding the waters of Mill creek." He further says, that they got the canal in navigable order in 1850, and that the through trade commenced in 1851, though some light boats were passed through before. There was no feeder at Mill creek at that time, and the canal continued to be used without any feeder there until 1854–5, or 1855–6. An alteration was then made, and the present feeder was constructed by placing a tide gate in the fixture at the creek.

It is not expressly stated, but, from the evidence, I think it is to be inferred that there was no feeder at the creek in the original structure there, which was washed away before Mr. Talcott took charge of the works in 1846. It appears that though the company after that date, proceeded to put that section of the canal in order for trade and business, and spent large sums of money for that purpose; and though a new structure was then, under the superintendence of their chief engineer, built at the creek, for the canal to cross the creek upon, yet that it was so built as entirely to exclude the waters of the creek from the canal, and that the canal continued to be used without any feeder there, for the space of four or five years from that time. These facts in the history of the canal are some evidence, that though a feeder there may be valuble, it has not always been deemed indispensable to the use and operation of the canal.

The canal now has four feeders by which it is fed from the tide waters, to wit, one at Hackensack river, one at Fiddler's Elbow, one at the Hudson, and this one at Mill creek. These four feeders, together with a steam pump at the Hackensack, are the means by which the canal is now supplied with water. This pump is only used occasionally. Whenever, by reason of the low state of the tides, the four feeders do not afford sufficient water, the pump is used to make up the deficiency, and there is no evidence that it has not at all times been found sufficient for this purpose.

There is no doubt that the feeder at Mill creek is a valu-

able addition to the complainants' means of supplying their canal with water, and that it would be an injury to them to be deprived of it.   But I do not think that it could properly be considered an irreparable injury.   The past history of the canal shows that this feeder is not indispensable.   There are times (always recurring when neap tides prevail) when this feeder does not supply the canal with any water at all. On such occasions the pump furnishes all that is needed, in addition to what may come in at the other feeders, and the navigation of the canal continues without interruption.   Any injury which might be done to this feeder by the operations of the defendants, would be I think capable of compensation in damages, and the ability of the defendants to respond in that way is not questioned.

The complainants claim a right to have an outlet from their canal into and through Mill creek.   Yet no outlet there was ever made until some time in July and August last, and a very short time before the filing of their bill in this cause. It was then made in a very imperfect manner, and but one boat, and that an empty one, has ever been passed through it.   The complainants themselves do not appear ever to have placed much value upon this right.

The rights of adjacency to the waters of Communipaw bay where the same wash the bank of their canal, the right of riparian owners, the right of navigating those waters and the waters of Mill creek, and the right to the lands under water between Beach and Henderson streets, claimed by the complainants, are not all admitted by the defendants, and some of them are expressly denied.

But if it be conceded that all these rights belong to the complainants, yet I cannot think that the injury apprehended to them from the proceedings of the defendants can be properly called irreparable, or that it is of such a character as to call for the interposition of this court by injunction.

The water along the canal where its bank is washed by the waters of Communipaw bay, and also at the mouth of Mill creek, is shallow at ordinary tides.   The right of navi-

gating those waters is not exclusively in the complainants; they can claim it only in common with others. It does not appear that the complainants have ever used the bank of their canal, where the same is washed by the waters of Communipaw bay, for the loading or unloading of boats, or that they expect or intend to do so. So far as relates, therefore, to these further rights claimed by the complainants, I am of opinion that, even if the complainants should suffer all the injury which they apprehend from the proceedings of the defendants, such injury could be fully compensated in damages, and that no injunction should be granted in regard to them.

I may here adopt, as applicable to this case, the language of a learned judge, and say : " There is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or which is more dangerous in a doubtful case, than the issuing of an injunction. It is the strong arm of equity that never ought to be extended unless to cases of great injury, where the courts of law cannot afford an adequate or commensurate remedy in damages. The right must be clear, and the injury be impending or threatened, so as to be averted only by the protecting, preventive process of injunction. But that will not be awarded in doubtful cases, or new ones not coming within well established principles ; for if it issues erroneously, an irreparable injury is inflicted, for which there can be no redress, it being the act of a court, and not of the party who prays for it." *Bonaparte* v. *Camden and Amboy R. R. Co., Baldwin's R.* 217, 218.

Other questions, interesting in themselves, and having an important bearing upon this case in certain of its aspects, were presented, and most ably discussed by counsel upon the argument. But under the views which I have already expressed, it is not necessary that I should consider or decide them.

I am of opinion, upon the whole case, that the motion for a permanent injunction should be denied, and the temporary

injunction dissolved as against all the defendants, with costs; and I do respectfully advise the Chancellor to make an order accordingly.