ALLSTATE INSURANCE COMPANY, PLAINTIFF-APPELLANT, v.
JOHN F. MALEC, DEFENDANT-RESPONDENT, AND LEAH
WILCOX, DEFENDANT.

Argued September 23, 1985—Decided September 22, 1986.

1

*Francis X. Ryan* argued the cause for appellant (*Green and Lundgren,* attorneys)

*P. Joseph Boyce* argued the cause for respondent.

*Bruce I. Goldstein* submitted a brief on behalf of *amici curiae,* Alliance of American Insurers, American Insurance

Association, and National Association of Independent Insurers (*Saiber, Schlesinger, Satz & Goldstein,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

Plaintiff, Allstate Insurance Company (Allstate), seeks a declaratory judgment that its standard automobile liability insurance policy did not afford coverage to its insured, defendant Leah Wilcox, for liability to defendant John F. Malec arising out of an automobile collision of October 17, 1981. Allstate relies on a specific provision in the policy that excludes liability coverage for intentional acts of the insured.

The trial court granted summary judgment for Malec. The Appellate Division, in an unreported opinion, affirmed, holding as a matter of both statutory construction and public policy that an automobile liability insurer cannot exclude coverage for liability caused by the intentional act of its insured. We granted certification, 99 *N.J.* 217 (1984), to review that holding. We reverse.

I

Allstate issued to Alicia Stewart, mother of defendant Wilcox, a policy of automobile liability insurance that was in effect on October 17, 1981. For purposes of this appeal Allstate concedes that on that date Wilcox was driving her mother's vehicle under circumstances that qualify Wilcox as an "insured" under the policy.

The Appellate Division's recitation of the incident that gives rise to the underlying claim of Malec against Wilcox is taken substantially from Malec's answers to interrogatories in the instant case and reads as follows:

On October 17, 1981, Wilcox drove the Stewart vehicle without permission.[1] Mrs. Stewart reported the incident to the Winslow Township Police Department. Defendant Malec, a member of the Gloucester Township Police Department, assumed chase of Wilcox upon her entering Gloucester Township. Pursuit speed at this time was in the area of 65 miles per hour. As they approached the Garwood Plaza in Erial, Mr. Malec attempted to pass Leah Wilcox's vehicle and was struck in the right side of his police unit by Ms. Wilcox's vehicle, forcing him into oncoming traffic. The pursuit continued north on Erial-New Brooklyn Road until coming into the area of Little Gloucester and Erial-New Brooklyn Road, which is controlled by a traffic light. Mr. Malec again attempted to stop Ms. Wilcox's vehicle by passing it and again was struck in the right side of the police unit by her vehicle, forcing him again off the lane into oncoming traffic. Leah Wilcox's vehicle at this point bounced off of the police unit and struck the rear of a green pickup truck stopped for the traffic light. After striking the truck, Ms. Wilcox's vehicle backed up and made a right turn around the truck and onto Little Gloucester Road. The pursuit continued onto Little Gloucester Road towards Blackwood-Clementon Road. When Ms. Wilcox's vehicle reached the first side driveway to the K-Mart Stores located on Little Gloucester Road, it turned in and at this point Mr. Malec was able to pull to the right of her vehicle and get ahead of it enough to attempt to stop it. At this point Ms. Wilcox's vehicle ran into the left side of the police unit and stopped. The

---

1As we have indicated, Allstate acknowledges, for today's purposes, that Wilcox was an "insured." We gather that the question of permissive use was rendered irrelevant because Wilcox was a resident of the named insured's household and as such was an "insured" under her mother's policy.

There are other underlying issues that serve to complicate both the liability and coverage questions, including the effect of the fireman's rule, see *Mahoney v. Carus Chem. Co.*, 102 *N.J.* 564 (1986), as extended to police officers, see *Entwistle v. Draves*, 102 *N.J.* 559 (1986), and *Wietecha v. Peoronard*, 102 *N.J.* 591 (1986). Should Malec ultimately establish that Wilcox's conduct amounted to intentional wrongdoing, he would gain a cause of action under the cases referred to above but would under today's decision lose the fruits of Allstate's liability coverage of Wilcox. Were he to establish simple negligence, the coverage would pertain but the cause of action would be lost. *Quare* the status of coverage if Malec proved that Wilcox's conduct was willful and wanton.

Also lurking in the background are questions of pre-1984 stacking of UM coverages furnished by Malec's own carrier and by his employer, Gloucester Township (see text *infra* at 5), see *Christy v. City of Newark,* 102 *N.J.* 598, 610–12 (1986), and the interplay between any workers' compensation benefits and UM recovery, see *Midland Ins. Co. v. Colatrella,* 102 *N.J.* 612 (1986); *Christy v. City of Newark, supra,* 102 *N.J.* at 610, and the necessary participation of the UM carriers in any litigation posing the issue of coverage, see *Parks v. Colonial Penn Ins. Co.,* 98 *N.J.* 42, 46–49 (1984).

We simply note the foregoing issues. There is no need for us to address any of them on this appeal.

Winslow police unit pulled to the left side of Ms. Wilcox's vehicle and Patrolman Leahy placed Ms. Wilcox under arrest, charging her with driving while unlicensed and with aggravated assault on a police officer. The outcome of those charges is unknown since they were apparently disposed of in Juvenile Court.

At the time of the occurrence Malec had automobile coverage on his own vehicle with Insurance Company of North America, whose policy included the statutorily-required uninsured motorist (UM) provision. See *N.J.S.A.* 17:28–1.1. In addition, the police vehicle that Malec was operating was self-insured by his employer, Gloucester Township, which also extended workers' compensation coverage.

Malec asserted claims for bodily injury arising out of the accident. Allstate denied coverage for the claims on the basis of a standard provision in its policy that "[t]his [liability insurance] policy does not apply * * * to bodily injury or property damages caused intentionally by or at the direction of the insured." It is the carrier's contention that Wilcox acted intentionally in ramming Malec's car, and therefore the policy's exclusion for intentional acts applies. To resolve the liability coverage issue Allstate instituted this declaratory judgment action. *See, e.g., Rova Farms Resort v. Investors Ins. Co.,* 65 *N.J.* 474, 509–10 (1974) (concurring opinion), and cases cited therein. Malec, who was joined as a defendant because of his "interest in the outcome of the litigation" (plaintiff's Complaint para. 6), filed an Answer, but defendant Wilcox did not respond.

Thereafter Allstate moved and Malec cross-moved for summary judgment. The trial court, in a letter opinion, determined that the New Jersey Automobile Reparation Reform Act, *N.J.S.A.* 39:6A–1 to –20 (No-Fault Act), which requires both liability and personal injury protection (PIP) coverage, contains only one section that sets forth permissible exclusions from coverage, and those permissible exclusions apply only to PIP coverage. See *N.J.S.A.* 39:6A–7. Therefore, reasoned the trial court, the legislature must not have intended to permit exclusions from liability coverage, so Allstate was "not relieved of its [statutory] obligation to provide liability insurance coverage to de-

fendant Wilcox on the basis of its contention that injury to Malec was the [result of] the intentional act of Wilcox." The trial court therefore denied summary judgment for Allstate and granted summary judgment to Malec.

The Appellate Division affirmed. As did the trial court, the court below interpreted the statutory scheme in respect of automobile liability insurance as not permitting a coverage exception for intentional acts. It further concluded that allowing Allstate's exclusion would violate the policy of construing automobile insurance legislation liberally in favor of broad protection for accident victims.

## II

We approach our decision with an abiding awareness of some basic principles: (1) Whenever an insurance policy and a governing statute are in conflict, the statute controls, and the policy is automatically amended by operation of law to conform to the statutory standard. *E.g.*, *Selected Risks Ins. Co. v. Zullo*, 48 *N.J.* 362, 373 (1966). (2) Legislation involving automobile insurance must be construed with "liberality in effecting the broadest protection of auto accident victims consistent with the language of the pertinent statute." *Motor Club of Am. Ins. Co. v. Phillips*, 66 *N.J.* 277, 293 (1984). (3) Statutorily mandated coverage cannot be countered by policy provisions that are contrary to the statutory mandates or public policy. *American Home Assurance Co. v. Hartford Ins. Co.*, 190 *N.J.Super.* 477, 485–86 (App.Div.1983). (4) Policy provisions that exclude coverage for liability resulting from intentional wrongful acts are "common," are "accepted as valid limitations," and are consistent with public policy. *See Ruvolo v. American Casualty Co.*, 39 *N.J.* 490, 496 (1963).

In resisting Allstate's appeal Malec adopts the analysis pursued by the courts below, which is to read the No-Fault Act as requiring coverage for liability arising from intentional injuries. The Appellate Division achieved that result by noting that the

Act permits the exclusion of PIP benefits when a person's conduct contributes to his injury or death in certain specified ways. In particular, the Appellate Division focused on *N.J.S.A.* 39:6A–7, which provides in pertinent part:

> Insurers may exclude a person from benefits under section 4 and section 10 where such person's conduct contributed to his personal injuries or death occurred in any of the following ways:
>
> (1) while committing a high misdemeanor or felony or seeking to avoid lawful apprehension or arrest by a police officer; or
>
> (2) while acting with specific intent of causing injury or damage to himself or others.

The court below then looked to *N.J.S.A.* 39:6A–4, which requires that every automobile liability insurance policy "shall provide personal injury protection coverage * * * for the payment of benefits without regard to negligence, liability or fault of any kind * * *." It emphasized the declaration in *Pennsylvania Nat'l Mut. Casualty Ins. Co. v. Estate of Miller*, 185 *N.J.Super.* 183 (App.Div.1982), that the statute's failure to exclude intentional acts and its express inclusion of the language "negligence, liability or fault of any kind" demonstrates an intent on the part of the legislature "not to limit the operation of the statute to occurrences resulting from unintentional conduct or to conduct which, although intentional, lacks a design to produce the result which occurs." *Id.* at 186–87. The Appellate Division agreed as well with the *Pennsylvania National* court that *N.J.S.A.* 39:6A–7 and –4 should be read *in pari materia*, and that when read that way those statutes demonstrate that the legislature intended "not to exclude the results of intentionally inflicted injury except where the conduct of the injured person was implicated." *Id.* at 187.

From all of the foregoing the court below concluded that "the relevant statutes [including *N.J.S.A.* 17:28–1.1, dealing with mandated coverage for automobile liability policies] do not exclude liability coverage for intentional acts." It buttressed that conclusion by reference to the policy of liberal construction for the protection of auto accident victims, see *Motor Club, supra*, 66 *N.J.* at 293, and rejected Allstate's reliance on *Am-*

*bassador Ins. Co. v. Montes,* 76 *N.J.* 477 (1978), for the proposition that as a matter of policy one should not be indemnified for liability resulting from one's willful wrongdoing.

■ Our careful review of the statutory scheme and the authorities bring us to a different result. The Appellate Division read too much into the applicable statutes and too little into the policy of not indemnifying against the consequences of one's own wrongful acts. In essence the court below construed the No-Fault Act by reference to the maxim *"expressio unius est exclusio alterius"* (express mention of one thing implies exclusion of all others). At best, this maxim is merely an aid in determining legislative intent, not a rule of law. *See Esso Standard Oil Co. v. Holderman,* 75 *N.J.Super.* 455 (App.Div. 1962), aff'd, 39 *N.J.* 355, appeal dismissed, 375 *U.S.* 43, 84 *S.Ct.* 148, 11 *L.Ed.*2d 107 (1963). Moreover, "great caution is necessary" in its application, *Gangemi v. Berry,* 25 *N.J.* 1, 11 (1957), for blind and mechanical application can often lead, as it did here, to an "improper interpretation" of the statute being construed. *See, e.g., Errichetti v. Merlino,* 188 *N.J.Super.* 309, 324 (Law Div.1982).

■ There is no indication that the No-Fault Act was intended to effect any change in New Jersey's system of *liability* insurance as such, save as provided in *N.J.S.A.* 39:6A–3 in respect of coverage. That section calls for compulsory liability insurance coverage in stated amounts in excess of the amounts that prevailed before the Act. It is apparent to us that at the time the No-Fault statutes were enacted, the legislature's primary focus was on an entirely new system of reparation for auto accident victims "without regard to negligence, liability or fault of any kind." *N.J.S.A.* 39:6A–4. Its purpose was to provide personal injury protection coverage on a first-party basis. Because the approach of the Act was so innovative, the legislature took pains to specify in detail the nature of the benefits and the types of losses to be compensated. See *N.J.S.A.* 39:6A–4. Likewise, the statute provided for certain

exceptions to the system of first-party reparation, as when the losses were compensated under certain other state and federal statutes, *N.J.S.A.* 39:6A–6, and when the accident victim was injured while committing certain crimes or "while acting with specific intent of causing injury or damage to himself or others." *N.J.S.A.* 39:6A–7.

Our conclusion that the No-Fault Act was not designed to overhaul the liability component of the automobile insurance system is borne out by the statement of the Act's sponsors, which declares that the proposed legislation "encompasses the recommendations of the Automobile Insurance Study Commission" (hereinafter Commission Report) [2]. Sponsors' Statement, A667 (1972). The Commission Report could scarcely be clearer in its statement of objective: to "supplement[ ] the present tort liability system with a package of first-party benefits." Commission Report at 99. The only recommendation of the Commission that touches on liability insurance as such is the one adopted almost verbatim (see Commission Report at xii) by the legislature in *N.J.S.A.* 39:6A–3: compulsory insurance, $15,000 coverage per person, $30,000 per accident, $5,000 property damage. The Commission Report may be searched in vain, as indeed may the No-Fault Act based on it, for any indication that henceforth liability carriers would be required to indemnify their insureds for their intentional wrongful acts.

A contrary conclusion is not suggested, much less compelled, by *Pennsylvania Nat'l Mut. Casualty Ins. Co. v. Estate of Miller, supra,* 185 *N.J.Super.* 183. The sole question in that case, as emphasized in the first sentence of Judge Fritz's eminently sound opinion, *id.* at 185,, and again thereafter, *id.* at 187,, was "whether an intentional occurrence, produced by design of the actor but wholly unexpected and untoward from

---

[2]The reference is to a report entitled *Reparation Reform for New Jersey Motorists* (Automobile Insurance Study Commission, Report to the Governor and the Legislature, pursuant to Joint Resolution No. 4, 1970) (December 1971).

the standpoint of the victims, is an 'accident' within the purview of personal injury protection benefits under *N.J.S.A.* 39:6A–4, commonly known as PIP benefits." The court, relying on the statute's admonition against consideration of "negligence, liability or fault of any kind," and recognizing the severely limited nature of the exclusions from PIP benefits found in *N.J.S.A.* 39:6A–7, see *supra* at 7, decided that for purposes of PIP benefits the word "accident" did not exclude intentional occurrences, "except where the conduct of the injured person was implicated." 185 *N.J.Super.* at 187. The decision pertains only to first-party PIP coverage; it does not purport to apply to coverage designed to protect an insured in respect of his liability to a third party. *Cf. Sciascia v. American Ins. Co.,* 183 *N.J.Super.* 352 (Law Div.1982), aff'd o.b., 189 *N.J.Super.* 236 (App.Div.1983) (UM coverage, unlike liability insurance but like PIP insurance, is first-party coverage designed to compensate injured party; therefore, "accident" must be viewed from perspective of injured insured rather than from that of tort-feasor. 183 *N.J.Super.* at 355, 357).

Certainly there is no provision in any of the statutes dealing with automobile insurance that specifically prohibits the exception in the Allstate policy. Nor do we read any of the statutes as requiring coverage for liability for intentional acts of the insured-tortfeasor that cause harm to a third party. Accordingly, an interpretation of the statutes that would allow the exclusion does no violence to the first three rubrics recited at the beginning of this section of the opinion: there is no conflict between the statutes and the policy exclusion, the policy has been construed consistently with the legislation, and the exclusion does not violate any statutorily mandated coverage.

That brings us to the fourth principle: a specific exclusion for intentional wrongful acts is valid and consistent with public policy. The question whether that principle retains its vitality is of some importance to the automobile insurance industry. We are told by *amici* that 180 of their 700 member companies write motor vehicle liability insurance in New Jersey and that

those companies write about 80 percent, by premium volume, of that insurance in this state. Moreover, "all or virtually all" of the policies written for that coverage contain exclusions of liability coverage for harm intentionally caused by the insured. Both counsel acknowledged at oral argument that neither of them had seen an automobile liability policy that did not contain the exclusion that is the subject of this appeal.

The most recent direct statement of this Court on the question of whether public policy can tolerate indemnifying, by the insurance mechanism, a wrongdoer for the civil consequences of his intentional acts is found in *Ambassador Ins. Co. v. Montes, supra,* 76 *N.J.* 477, which involved a comprehensive general liability insurance policy. *Id.* at 480. There the named insured intentionally set fire to the covered property. Four people died in the fire. In the ensuing civil action for the wrongful death of one of the victims, Ambassador Insurance Company refused to defend its insured, and thereafter brought an action for a declaratory judgment of its obligation under the policy. The trial court denied coverage on the ground that the decedent's injuries and death were the "intended result of an intended act." *Id.* at 480–81. The Appellate Division reversed. It noted that the Ambassador policy "did not contain an express exclusion for the consequences of an intentional wrongdoing," *id.* at 481,, but concluded that the omission of such an exclusion was "immaterial because public policy prohibits indemnity for the civil consequences of one's intentional wrongdoing." *Ibid.* It held, however, that because the insured did not intend to injure or kill anyone, there was coverage. *Ibid.* This Court affirmed the judgment, but on a different basis.

In the course of its opinion the Court acknowledged—significantly for today's purposes—the general proposition that "public policy prohibits insurance indemnity for the civil consequences of an insured's intentional wrongdoing." *Id.* at 482. As the opinion states:

It has been said that indemnification of a person for a loss or damage incurred as a result of his wilful wrongdoing in violation of a criminal statute is

contrary to public policy. Were a person able to insure himself against the economic consequences of his intentional wrongdoing, the deterrence attributable to financial responsibility would be missing. Further, as a matter of moral principle no person should be permitted to allege his own turpitude as a ground for recovery. Accordingly, we have accepted the general principle that an insurer may not contract to indemnify an insured against the civil consequences of his own wilful criminal act.

[*Id.* at 482–83 (citations omitted).]

The Court added, however, that the stated principle was "not to be applied under all circumstances." *Id.* at 483. The circumstances that led the Court to find coverage in *Ambassador* were that (1) the policy provided on its face for coverage, (2) there was no exclusionary clause or other pertinent limitation in the policy, (3) payment of the policy proceeds would protect an innocent third person without benefitting the wrongdoer-insured, and (4) the insurer could indemnify itself by being subrogated to the third party's rights against the insured-tortfeasor. *Id.* at 482–86.

*Ambassador* has been read, correctly, as having "modified the prior-settled rule that indemnification by liability insurance of a person for a loss incurred as a result of his own willful wrongdoing in violation of a criminal statute is contrary to public policy * * *." *New Jersey Mfrs. Ins. Co. v. Brower*, 161 *N.J.Super.* 293, 300 (App.Div.1978). The *Ambassador* holding has been held not to apply, however, where, as in this case, the policy contains a specific clause excluding liability coverage for the insured's intentional wrongful act. *Ibid.*

*Ambassador* was decided by a divided Court. The appeal produced three opinions. Neither time nor the opportunity for further deliberation has altered the conscientiously held views of the remaining members who participated in *Ambassador.* The Court is therefore not of one mind on the broad policy question of whether, in the absence of a specific exclusion, a liability insurer can nevertheless be called on to indemnify a wrongdoer for his intentional misconduct that results in liability to an innocent third party.

But we need not revisit *Ambassador.* "We need not even count heads * * * or display our ardor for, or aversion to, the respective contesting viewpoints," see *Green v. Sterling Extruder Corp.*, 95 *N.J.* 263, 270 (1984). We are content to give *Ambassador* a narrow reading and to limit today's decision to no more than the circumstances require. We therefore adopt the view of *New Jersey Mfrs. Ins. Co. v. Brower, supra,* 161 *N.J.Super.* at 300, that *Ambassador* is distinguishable on its facts from this case and does not stand in the way of our declaring that a specific exclusion, in an automobile liability insurance policy, from coverage for the insured's liability caused by his intentional wrongful acts does not violate either public policy or, as we have held, *supra* at 6–12, the statutory scheme. Particularly is this so where, as here and doubtless in the vast majority of automobile cases, there are available to the claimant other sources of recovery, such as PIP benefits, UM coverage, and workers' compensation benefits.

### III

We hold that the Allstate policy provision at issue is valid. We therefore reverse the judgment of the Appellate Division.

There has not yet been a determination of whether the Allstate exclusion applies in this case—that is, of whether Wilcox intended to injure Malec. The cause is remanded, therefore, to the Law Division for further proceedings consistent with this opinion.

No costs on this appeal.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—None.