Alfa Specialty Insurance Company ("Alfa") appeals from a judgment of the Geneva Circuit Court denying its request that the court enter a judgment declaring that the automobile insurance policy it had issued to Richard Franklin Croft excluded coverage for damage Croft caused to a mobile home while he was fleeing from law-enforcement officers.
The following facts are undisputed. Croft is the insured under Alfa policy number N00127000, which covered Croft's 1976 Ford F100 truck. On December 28, 2000, while Croft's policy was in effect, Croft drove his truck to Red Bay, Florida. A Florida sheriff's deputy began pursuing Croft. Croft refused to stop, and he led various sheriff's deputies on a high-speed chase to Geneva County. When Croft encountered a police roadblock on Alabama Highway 87, he left the roadway, lost control of the truck, and collided with a double-wide mobile home owned by Joseph W. Jennings and his wife, Michelle Jennings. The collision caused approximately $19,513 in damage to the mobile home. Joseph W. Jennings and his minor daughter were present in the mobile home at the time of the collision, but apparently they were not injured. Croft was injured in the collision and received medical treatment at a local hospital.
Florida authorities charged Croft with aggravated fleeing, a felony. In July 2001, Croft pleaded guilty to the charges.
Alabama authorities charged Croft with reckless endangerment and with carrying a pistol in a vehicle without a permit, both of which are class-A misdemeanors. In August 2001, Croft pleaded guilty to the reckless-endangerment charge, and he was given a 90-day suspended sentence.[1] In October 2001, based upon a request for restitution filed by State Farm Fire and Casualty Company, which insured the Jenningses' mobile home, Croft was ordered to pay $19,513 as restitution; Croft was ordered to pay the first $1,000 to the Jenningses and the remaining $18,513 to State Farm.
In November 2001, Alfa filed a declaratory-judgment action in the Geneva Circuit Court against Croft, the Jenningses, and State Farm. Alfa alleged that the Jenningses and State Farm, which had a subrogation interest in any damage award the *Page 197 
Jenningses might recover, intended to file an action against Croft that would implicate the liability provisions of Croft's policy and that Croft might file a claim under the policy for his medical expenses. Based upon specific exclusions contained in Croft's policy, Alfa alleged that it had no obligation to pay Croft's medical expenses and that it had no duty to defend and indemnify Croft from any claim by the Jenningses and State Farm. Alfa requested that the trial court enter a judgment declaring the rights of Alfa and the defendants under Croft's policy.
In January 2002, the Jenningses and State Farm filed an answer admitting most of the allegations contained in Alfa's complaint but alleging that the policy exclusions were not applicable. The Jenningses and State Farm alleged that the policy exclusions were unenforceable against them, that the exclusions violated public policy, that the exclusions were void, and that Alfa should be estopped from asserting the exclusions.
In June 2002, Joseph W. Jennings and State Farm filed a cross-claim against Croft based on negligence and wantonness. They alleged that, as a result of Croft's actions, State Farm had been required to pay Joseph W. Jennings $18,513 and that Joseph W. Jennings had been required to pay a deductible of $1,000, which Joseph W. Jennings claimed as his damages. Croft filed a pro-se answer to the cross-claim alleging that he had been having a psychotic episode when he caused the damage to the Jenningses' mobile home.
In March 2003, Alfa filed a motion for a summary judgment in its declaratory-judgment action. The motion was supported by several affidavits, a certified copy of Croft's policy, and certified copies of Croft's criminal records from Florida and Alabama. Citing Hooper v. Allstate Insurance Co.,571 So.2d 1001 (Ala. 1990), Alfa argued that the terms of Croft's policy excluded coverage for the damage that Croft had caused to the Jenningses' mobile home.[2]
As to liability coverage, Croft's policy states, in part:
"LIABILITY COVERAGE
 "[W]e [Alfa] will pay damages for bodily injury or property damage for which any covered person [Croft] becomes legally responsible because of a car accident arising out of the ownership, use or maintenance of a covered car. . . . We will settle or defend lawsuits asking for these damages until your coverage has been exhausted with attorneys hired and paid by us, as we consider appropriate. . . . We have no duty to defend any suit . . . for bodily injury or property damage not covered under this policy.
". . . .
"EXCLUSIONS
"We do not provide Liability Coverage for:
". . . .
 "11. Any liability arising out of the use of a car in connection with the commission of or the attempt to commit a criminal act by a covered person."
(Emphasis added.)
The Jenningses and State Farm filed a response to Alfa's motion for a summary judgment. Based in part on caselaw from other jurisdictions, specifically Weekes v. Atlantic NationalInsurance Co., 370 F.2d 264 (9th Cir. 1966), and Cotton StatesMutual Insurance Co. v. Neese, 254 Ga. 335, 329 S.E.2d 136
(1985), they argued that *Page 198 
the policy exclusion should not apply based on public-policy considerations.
On May 5, 2003, the trial court entered an order on the case action summary sheet that stated:
 "Motion for Summary Judgment filed by Alfa Specialty Ins. Company denied. . . . Mr. Croft's original contract has not, as a matter of law precluded any coverage under the liability and medical pay provision of the policy in question so far as innocent third parties are concerned. That the current contract of Mr. Croft will preclude Mr. Croft from coverage on any injuries sustained by Mr. Croft."
(Emphasis added.)
On May 28, 2003, the trial court amended its May 5 order, nunc pro tunc. The new order stated:
 "Motion for Summary Judgment filed by Alfa Specialty Ins. Company denied. . . . Mr. Croft's criminal conduct has not, as a matter of law precluded any coverage under the liability and medical pay provision of the policy in question so far as innocent third parties are concerned. That the criminal conduct of Mr. Croft will preclude Mr. Croft from coverage on any injuries sustained by Mr. Croft."
(Emphasis added.)
Also on May 28, 2003, Alfa obtained a certification from the trial court pursuant to Rule 5, Ala. R.App. P., that the order denying its motion for a summary judgment as to the Jenningses and State Farm involved a controlling question of law and that an immediate appeal would materially advance the ultimate termination of the litigation. Alfa filed a petition for permission to appeal with the Alabama Supreme Court. However, the Alabama Supreme Court thereafter issued an order stating:
 "The petition for permission to appeal having been filed and duly considered by this Court, and, it appearing to the Court that the trial court's order of May 5, 2003, completely adjudicates claims for declaratory relief, it appears that the order is a judgment which may be appealed when the order is made final, either by certification pursuant to Rule 54(b), Alabama Rules of Civil Procedure, or by adjudication of the remaining claims in this case.
 "IT IS ORDERED that the petition of Alfa Specialty Insurance Company for permission to appeal is denied."[3]
After our Supreme Court denied Alfa's petition for permission to appeal, Alfa filed a motion requesting that the trial court certify the May 28, 2003, order as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P. In August 2003, the trial court certified the May 28, 2003, order as a final judgment. Alfa appealed to the Alabama Supreme Court. The Supreme Court concluded that the appeal was within the appellate jurisdiction of this court and transferred the case to this court.
Alfa contends on appeal that the damage to the Jenningses' mobile home arose "out of the use of a car in connection with the commission of or the attempt to commit a criminal act by a covered person" and that, therefore, the incident is excluded from coverage by Croft's policy. Alfa also contends that the "criminal acts" exclusion at issue does not violate the public policy that the Legislature sought to address in the Mandatory Liability Insurance Act, Ala. Code 1975, § 32-7A-1 et seq. ("the MLIA"), particularly Ala. Code 1975, § 32-7A-4, which became effective on *Page 199 
June 1, 2000. See Act. No. 2000-554, Ala. Acts 2000.
 "[I]nsurance companies have the right to limit the coverage offered through the use of exclusions in their policies, provided that those exclusions do not violate a statute or public policy. . . . If an individual purchases a policy containing an unambiguous exclusion that does not violate a statute or public policy, courts will enforce the contract as written."
Hooper v. Allstate Ins. Co., 571 So.2d at 1002. Croft's policy is unambiguous; by its terms it clearly excludes coverage under the undisputed facts of this case. See Hooper,571 So.2d at 1002-03 and cases cited therein regarding "criminal acts" exclusions. Thus, the issue that we must address is whether Alfa is precluded by the MLIA, itself, or by public policy, from enforcing the "criminal acts" exclusion in Croft's policy.
The intention of the legislature in enacting the MLIA and the question of public policy raised in this case are closely related, and we consider them together. As to the former, "`[t]his court's role in the area of statutory construction is to ascertain and effectuate the intent of the legislature.'" Sam v.Beaird, 685 So.2d 742, 744 (Ala.Civ.App. 1996) (quoting Bronnerv. Gatewood, 512 So.2d 102, 105 (Ala.Civ.App. 1986)). As to the latter,
 "[i]t is generally recognized that the public policy of a state is to be found in its Constitution and statutes and judicial decisions. In order to ascertain the public policy of a state in respect to any matter, the acts of the legislative department should primarily be looked to, because a legislative act, if constitutional, declares in terms the policy of the state."
Denson v. Alabama Fuel Iron Co., 198 Ala. 383, 391,73 So. 525, 529 (1916).
Further, to the extent this or any case requires us to look beyond the provisions of a statute directly at issue in order to ascertain whether a contractual provision is in violation of public policy, our Supreme Court has repeatedly declared that "[t]he principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reason on which the doctrine rests."Lowery v. Zorn, 243 Ala. 285, 288, 9 So.2d 872, 874 (1942);see also, e.g., Livingston v. Tapscott, 585 So.2d 839 (Ala. 1991); Ex parte Rice, 258 Ala. 132, 61 So.2d 7 (1952). As our Supreme Court explained in Milton Construction Co. v. StateHighway Department, 568 So.2d 784 (Ala. 1990),
 "`The courts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain. Since the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts of justice is to maintain and enforce contracts rather than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare. . . .
 "`Many courts have cautioned against recklessness in condemning agreements as being in violation of public policy. Public policy, some courts have said, is a term of vague and uncertain meaning which it is the duty of the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law. Other courts have approved the statement of an English judge that public policy is an unruly horse astride of *Page 200 
which one may be carried into unknown paths. Considerations such as these have led to the statement that the power of the courts to declare an agreement void for being in contravention of sound public policy is a very delicate and undefined power and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.'"
568 So.2d at 788 (quoting 17 Am.Jur.2d Contracts § 178 (1964) (last emphasis added; other emphasis supplied by the Supreme Court in Milton).
The MLIA states, in part:
 "(a) No person shall operate . . . a motor vehicle designed to be used on a public highway unless the motor vehicle is covered by a liability insurance policy, motor vehicle liability bond, or deposit of cash.
 "(b)(1) The insurance policy shall be issued in amounts no less than the minimum amounts set for bodily injury or death and for destruction of property under Section 32-7-6(c).
 "(2) The motor vehicle liability bond shall be in the amount of not less than fifty thousand dollars ($50,000). The bond shall be conditioned on the payment of the amount of any judgment rendered against the principal in the bond or any person responsible for the operation of the principal's motor vehicle with his or her express or implied consent, arising from injury, death, or damage sustained through the use, operation, maintenance, or control of the motor vehicle within the State of Alabama.
 "(3) The deposit of cash with the State Treasurer shall be a sum of not less than fifty thousand dollars ($50,000).
 "(c) Only an insurer authorized to do business in this state shall issue a policy pursuant to this section for any vehicle subject to registration under Chapter 12 of Title 40. Nothing herein shall deprive an insurer of any policy defense available at common law."
Ala. Code 1975, § 32-7A-4.
For purposes of § 32-7A-4(b)(2), a "motor vehicle liability bond" is defined as "[a] bond of a surety company duly authorized to transact business in this state, which is conditioned for payments in amounts and under the same circumstances as would berequired in a motor vehicle liability insurance policy." Ala. Code 1975, § 32-7A-2(11) (emphasis added). In contrast, §32-7A-2(5), Ala. Code 1975, defines a "deposit of cash" simply as "[f]unds deposited with and held by the State Treasurer as security for payment by the depositor . . . of all judgments
rendered against the depositor . . . arising from injury, death, or damage sustained through use, operation, maintenance, or control of the motor vehicle within the State of Alabama." (Emphasis added.)[4] It is thus apparent that the legislature contemplated that there would be "circumstances" as to which neither the motor-vehicle liability bond contemplated by § 32-7A-4(b)(2) nor the motor-vehicle liability insurance policy contemplated by § 32-7A-4(b)(1) would provide coverage.
The fact that the legislature contemplated that there would be "circumstances" as to which motor-vehicle liability insurance policies under the MLIA would not provide coverage is not surprising. The MLIA *Page 201 
was enacted by the legislature against the backdrop of a substantial body of existing law governing automobile liability insurance policies issued in this state, including caselaw, statutes, and regulations. Further, § 32-7A-22 provides that the MLIA is to be construed in pari materia with other laws. Among the laws in place when the MLIA was enacted was § 27-14-8, Ala. Code 1975, pursuant to which provisions of insurance policies, including policies of the nature at issue in the present case, must be approved by the Commissioner of Insurance. It is in this context that we recognize that the MLIA was enacted so as to require otherwise financially irresponsible drivers to maintain automobile liability insurance of the nature theretofore normally and routinely maintained by responsible drivers in this state. To conclude otherwise would require us to construe the MLIA as having been intended to abrogate exclusions, terms, conditions, and other insurance-policy provisions that theretofore had met with approval under Alabama law, including approval by the Commissioner of Insurance, and that were contained in liability insurance policies in force throughout Alabama at the time of the enactment of the MLIA.
Further, we note that the obligation imposed by the MLIA to maintain automobile liability insurance is an obligation imposed on those persons who own, operate, register, or maintain registration of motor vehicles covered by the MLIA. The provisions of the MLIA at issue here do not purport by their terms to govern or impose any obligation upon insurers.[5]
Our Supreme Court has stated in the context of a homeowner's insurance policy that "insurance companies have the right to limit their liability and to write policies with narrow coverage. . . . No public policy considerations dictate that an insurer must indemnify a third party for the criminal acts of an insured." Hooper, 571 So.2d at 1003; see also Hill v.Campbell, 804 So.2d 1107, 1111 (Ala.Civ.App. 2001) (applyingHooper and holding, in part, that it did not violate public policy for an automobile liability insurance company to exclude coverage *Page 202 
for punitive damages not based on wrongful death where the exclusion did not implicate the mandatory coverage provisions of Alabama's uninsured-motorist statute, i.e., § 32-7-23). Although we recognize that the mandatory liability protection requirement in the MLIA distinguishes the present case to some degree fromHooper, based on our review of the applicable statutory law discussed above, our conclusion as to the legislature's intent in enacting the MLIA, and the undisputed material facts in the present case, we cannot conclude that the present case is distinguishable from Hooper on public-policy grounds.
The Jenningses and State Farm urge that upholding the "criminal acts" exclusion would allow an insurer to exclude coverage when an insured was "speeding, running a red light, running a stop sign, driving under the influence, or any other conceivable violation of law or rules of the road." In Cotton States, the Georgia Supreme Court suggested that automobile liability coverage exclusions pertaining to such circumstances could be unenforceable as a matter of Georgia public policy.254 Ga. at 338 n. 5, 329 S.E.2d at 139 n. 5, and accompanying text. However, whether any of those offenses would be sufficient, in a particular case, to fall within a "criminal acts" exclusion is not at issue in this case; nor are we called upon to determine whether the exclusion of one of those offenses would be against public policy. Our holding today is limited to the particular facts presented, which we have carefully examined in the context of the admonition, noted above, to abrogate contracts on public-policy grounds only with great caution and in cases free from doubt.
In regard to the cases from other jurisdictions relied upon by the Jenningses and State Farm, specifically Weekes and CottonStates, we have reviewed those cases and are not dissuaded from our conclusion by them. We have already noted one distinction between the MLIA and the statute at issue in Cotton States. See
note 5 supra. As for Weekes, it contains no discussion of the public-policy exception applied by the court in that case. See370 F.2d at 272.[6]
For the reasons discussed above, the trial court's judgment declaring that Mr. Croft's criminal conduct did not preclude *Page 203 
any coverage under the policy in question is reversed, and the cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
CRAWLEY and THOMPSON, JJ., concur.
PITTMAN, J., concurs in the result, without writing.
YATES, P.J., dissents, with writing.
[1] In July 2001, Croft pleaded guilty in a Florida court to the aggravated-fleeing charge.
[2] Alfa also alleged that Croft's criminal conduct excluded Alfa from any responsibility for Croft's medical expenses. The trial court granted Alfa's motion for a summary judgment as to Croft. Croft has not appealed.
[3] The trial court appeared to have fully adjudicated Alfa's claim seeking a judgment declaring that Croft's policy did not provide coverage for the incident at issue, in effect entering a summary judgment against Alfa and for the Jenningses and State Farm.
[4] A "liability insurance policy" is defined as "[a]n owner's or an operator's policy of liability insurance, issued by an insurance carrier duly authorized to transact business in this state, to or for the benefit of the person or vehicle identified in the policy as insured." Ala. Code 1975, § 32-7A-2(9).
[5] This is a distinction between Alabama's MLIA and the compulsory insurance statute at issue in Cotton States.
In contrast, § 32-7-23, a part of Alabama's Motor Vehicle Safety-Responsibility Act, § 32-7-1 et seq., Ala. Code 1975 ("the MVSRA"), does purport to govern automobile liability insurers and, specifically, imposes an obligation as to a type of coverage that must be included in automobile liability insurance policies:
 "No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in subsection (c) of Section 32-7-6, under provisions approved by the Commissioner of Insurance for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom; provided, that the named insured shall have the right to reject such coverage."
Ala. Code 1975, § 32-7-23(a). Thus, our courts have held that §32-7-23 will be inferred into an automobile insurance policy issued in this state if the statutory conditions are present.See Ex parte Potete, 409 So.2d 429 (Ala. 1981); see also StateFarm Mut. Auto. Ins. Co. v. Scott, 707 So.2d 238, 241
(Ala.Civ.App. 1997) ("A necessary corollary to the principle that § 32-7-23 is a mandatory provision is that an insurer will not be permitted to deny the benefits provided for in § 32-7-23 `by inserting provisions restricting an insured's right to recovery.' Bibb Allen, Alabama Liability Insurance Handbook, § 21-6 (1996).").
[6] Principles that may be drawn from cases from other states involving intentional infliction of property damage or personal injury are supportive of our conclusion. See, e.g., Snyder v.Nelson, 278 Or. 409, 414-15, 564 P.2d 681, 684 (1977) ("The thrust of the [automobile liability insurance] Law apparently is to make certain that an insured has coverage of normal scope
which cannot be voided subsequent to an accident by the insured's own statements or lack of cooperation. It is, therefore, our conclusion that the [automobile liability insurance] was not intended to require coverage for intentionally inflicted personal injuries or property damages." (Emphasis added.)); Allstate Ins.Co. v. Malec, 104 N.J. 1, 514 A.2d 832 (1986) (holding that New Jersey's compulsory automobile liability insurance statute did not prohibit a policy exclusion for the insured's intentional wrongful acts); see also Williams v. Diggs, 593 So.2d 385, 387
(La.Ct.App. 1991) ("It is true, as maintained by plaintiff, that the public policy of providing compensation to victims injured by motor vehicles is a strong one and has been applied by the courts of this state a number of times to strike down as invalid certain exclusionary clauses in automobile liability policies. However, when considering an intentional injury exclusion in an automobile liability policy, another well-established public policy must also be given consideration. This is the policy against allowing a person to insure himself against his own intentional acts causing injury to others."); Utica Mut. Ins. Co. v. TravelersIndem. Co., 223 Va. 145, 147, 286 S.E.2d 225, 226 (1982) (holding that there was "nothing in the [automobile liability insurance] Act which mandates that certified policies provide greater protection to the insured than the standard policy." (Emphasis added.)).