649 A.2d 1272

KURT LINDSTROM, BY HIS GUARDIAN AD LITEM, GEORGE K. LINDSTROM, AND GEORGE K. LINDSTROM, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. THE HANOVER INSURANCE COMPANY ON BEHALF OF THE NEW JERSEY AUTOMOBILE FULL INSURANCE UNDERWRITING ASSOCIATION, DEFENDANT–RESPONDENT.

Argued September 13, 1994—Decided December 19, 1994.

*Patricia D. Connelly* argued the cause for appellant (*Shebell & Schibell,* attorneys; *Peter Shebell, Jr.,* of counsel).

*Mark S. Hochman* argued the cause for respondent (*Gertler & Hanna,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

Plaintiff Kurt Lindstrom sustained grave injuries resulting from a gunshot wound inflicted in a drive-by shooting. He seeks recovery of personal-injury-protection (PIP) benefits under his father's automobile insurance policy, issued by defendant. The trial court concluded that the nexus between the injury and the automobile was not substantial enough to bring the loss within PIP coverage, and therefore it entered summary judgment in favor of the defendant-insurer. The Appellate Division affirmed, 269 *N.J.Super.* 339, 635 *A.*2d 559 (1993). We granted certification, 136 *N.J.* 31, 641 *A.*2d 1041 (1994), and now reverse.

I

The facts are undisputed. Plaintiff Kurt Lindstrom was a student at the University of North Carolina–Wilmington. He was attending an outdoor party at the University on April 15, 1989, when an occupant of a passing car fired a shot into the crowd. The bullet struck Kurt behind his right ear and pierced his spinal column, rendering him a quadriplegic. The authorities apprehended and successfully prosecuted the assailant.

As a member of his father's household in Eatontown, Kurt was covered by the automobile insurance policy issued by defendant, Hanover Insurance Company, to the father, plaintiff George K. Lindstrom. (Inasmuch as his son is totally disabled, George sues as Kurt's guardian ad litem as well as in his individual capacity.

Because the interests of father and son are identical, we refer hereafter to "plaintiff" in the singular.)

At the time of the occurrence the statute that defines eligibility for PIP benefits mandated

the payment of benefits without regard to negligence, liability or fault of any kind, to the named insured and members of his family residing in his household who sustained bodily injury as a result of an accident * * * as a pedestrian, caused by an automobile or by an object propelled by or from an automobile.

[*L.*1988, *c.* 119, § 3 (codified at *N.J.S.A.* 39:6A–4).]

Plaintiff demanded payment under the policy for Kurt's medical expenses and "essential services." When defendant refused payment, plaintiff instituted this suit to obtain PIP benefits.

On the parties' cross-motions for summary judgment the trial court ruled that some connection must exist between the insured and "the manner by which the injury[-]producing event occurs." Because it found no "operative automobile[-]like activity to justify application of the coverage," the court entered summary judgment for defendant.

Plaintiff appealed. In determining whether Kurt's injuries were within the contemplation of *N.J.S.A.* 39:6A–4 ("section four"), the Appellate Division reviewed cases concerning the applicability of PIP coverage to intentional criminal acts. See 269 *N.J.Super.* at 341–43, 635 *A.*2d 559. The underlying theme in those cases is the requirement of a legal relationship between the automobile and the plaintiff's injury such that the automobile was a cause of that injury and not merely an "attending circumstance." The Appellate Division in this case concluded that the fact that plaintiff was injured by a bullet that had been propelled from a gun and not from the car itself "attenuate[d] the connection between the automobile and the injury." *Id.* at 344, 635 *A.*2d 559. The court further ruled that the parties to the insurance contract did not contemplate that a deliberate shooting of a pedestrian would be within the policy coverage. Because the Appellate Division did not find the requisite "substantial nexus between the automobile and the criminal act," *ibid.*, it affirmed the judgment of the trial court.

## II

Plaintiff argues that because the bullet that caused the injury was propelled from an automobile, the incident is within the scope of section four. He asserts that the Appellate Division's denial of coverage based on the criminal activity underlying the injury incorrectly focused on the actor's intent. Under a PIP claim, according to plaintiff, the only relevant question is whether the bullet was propelled from an automobile within the meaning of section four. Plaintiff asks that we not apply the "substantial nexus" test to his case. He argues in the alternative that if the substantial-nexus test does apply, the facts meet that test because the car was "inextricably linked to the crime."

■ Plaintiff's argument that the substantial-nexus test does not apply to family-member pedestrians need not long detain us. The language of section four is unmistakable in its limitation of PIP coverage to members of the insured's household who "sustained bodily injury * * * as a pedestrian, caused by an automobile or by an object propelled by or from an automobile." In light of the statutory requirement of causation, we have previously applied the substantial-nexus test in the PIP-coverage context, see *Smaul v. Irvington General Hospital,* 108 *N.J.* 474, 477–78, 530 *A.*2d 1251 (1987), and continue to do so in this family-member pedestrian case.

In resisting plaintiff's claim, defendant relies on *Westchester Fire Insurance Co. v. Continental Insurance Co.,* 126 *N.J.Super.* 29, 312 *A.*2d 664 (App.Div.1973), *aff'd o.b.,* 65 *N.J.* 152, 319 *A.*2d 732 (1974). There the court held that an injury sustained by a victim struck by a board thrown from a moving automobile came within the scope of the automobile-liability-policy provision "arising out of the ownership, maintenance or use" of the automobile and that the automobile carrier was obligated to defend the suit alleging such bodily injury. 126 *N.J.Super.* at 35, 38, 312 *A.*2d 664. In reaching that conclusion the Appellate Division expressed doubt about, without however deciding, the proposition that a causal connection could be found "between the discharge of guns

or other explosive devices and their happenstance location in the car." *Id.* at 40, 312 *A.*2d 664. On the strength of that intimation, defendant asserts that we should reject plaintiff's claim. Moreover, defendant argues, the use of the automobile in this drive-by shooting was irrelevant to plaintiff's injury. According to defendant, because no substantial nexus exists and because no New Jersey case has awarded PIP benefits to victims of shootings, this Court should affirm the judgment below.

### III

We begin by setting out the basic principles that guide our deliberation. New Jersey's no-fault compulsory automobile-insurance scheme, found in the New Jersey Automobile Reparation Reform Act, *N.J.S.A.* 29:6A–1 to –35 (the Act), must be "liberally construed so as to effect the purpose thereof." *N.J.S.A.* 39:6A–16. This Court has characterized PIP coverage as " 'a social necessity' that should be given 'the broadest application consistent with the statutory language.' " *Darel v. Pennsylvania Mfrs. Ass'n Ins. Co.,* 114 *N.J.* 416, 425, 555 *A.*2d 570 (1989) (quoting *Amiano v. Ohio Casualty Ins. Co.,* 85 *N.J.* 85, 90, 424 *A.*2d 1179 (1981)); *accord Fisher v. Hanover Ins. Co.,* 224 *N.J.Super.* 552, 557, 540 *A.*2d 1344 (App.Div.1988); *Vicari v. Nationwide Ins.,* 174 *N.J.Super.* 463, 468, 416 *A.*2d 977 (App.Div.1980), *certif. denied,* 85 *N.J.* 464, 427 *A.*2d 562 (1991); *New Jersey Mfrs. Ins. Co. v. Griffin,* 253 *N.J.Super.* 173, 178, 601 *A.*2d 261 (Law Div.1991). Such a broad application represents public policy favoring coverage. *See Allstate Ins. Co. v. Malec,* 104 *N.J.* 1, 6, 514 *A.*2d 832 (1986); *JFK Memorial Hosp. v. Kendal,* 205 *N.J.Super.* 456, 458, 501 *A.*2d 197 (Law Div.1985). Insureds are entitled to coverage in accordance with their objectively-reasonable expectations that are supported by any fair interpretation of the law. *See Werner Indus. v. First State Ins. Co.,* 112 *N.J.* 30, 35, 548 *A.*2d 188 (1988); *Westchester Fire, supra,* 126 *N.J.Super.* at 36, 312 *A.*2d 664; *see also SL Indus. v. American Motorists Ins. Co.,* 128 *N.J.* 188, 205, 607 *A.*2d 1266 (1992) (discussing insured's objectively-reasonable expecta-

tions). In respect of the occurrence, the Legislature sought to ensure "the broadest coverage possible so long as an automobile was involved in that which happened." *Pennsylvania Nat'l Mut. Casualty Ins. Co. v. Estate of Miller,* 185 *N.J.Super.* 183, 187, 447 *A.*2d 1344 (App.Div.1982). Accordingly, "where the Legislature has 'made a choice of language [that] fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators.'" *Sheeran v. Nationwide Mut. Ins. Co.,* 80 *N.J.* 548, 556, 404 *A.*2d 625 (1979) (quoting *Sears, Roebuck & Co. v. United States,* 504 *F.*2d 1400, 1402 (C.C.P.A.1974)); *accord Griffin, supra,* 253 *N.J.Super.* at 177, 601 *A.*2d 261.

Section four originally protected against "injury as the result of an automobile accident." *L.*1972, *c.* 70, § 4. In 1972 the Legislature broadened the scope of the statute to cover "injury as the result of an accident involving an automobile." *L.*1972, *c.* 203, § 3. The amended version was designed to provide the "broadest possible coverage so long as an automobile was involved." *Pennsylvania Nat'l, supra,* 185 *N.J.Super.* at 187, 447 *A.*2d 1344. In 1983, however, the Legislature tightened the requirements for family-member pedestrians, limiting coverage to instances in which the pedestrian was "struck by an automobile." *L.*1983, *c.* 362, § 7. In 1984, the Legislature again amended the wording, requiring that the family-member pedestrian be "struck by an automobile *or* by an object propelled by or from an automobile." *L.*1984, *c.* 40, § 3. The 1984 amendment tightened PIP-eligibility requirements generally, *Vasil v. Zullo,* 238 *N.J.Super.* 572, 576, 570 *A.*2d 464 (App.Div.1990), but broadened coverage for family-member pedestrians. Moreover, section four continued to provide the broadest protection consistent with its language. *Fisher, supra,* 224 *N.J.Super.* at 557, 540 *A.*2d 1344. The 1988 amendment again broadened family-member pedestrian coverage to include injuries "caused by an automobile or by an object propelled by or from an automobile," *L.*1988, *c.* 119, § 3, eliminating the requirement that the vehicle literally strike the insured. *Cf. Ingraham v. Travellers Cos.,* 217 *N.J.Super.* 126, 524 *A.*2d 1319

(App.Div.1987), *aff'd o.b.,* 110 *N.J.* 67, 539 *A.2d* 733 (1988) (denying PIP coverage under 1983 law to family-member pedestrian who was run off road by automobile and who lost foot in resulting fall, because no actual contact occurred between car and insured).

■ After the restrictive language of the 1983 amendment, the trend in the development of section four has been to broaden family-member pedestrian coverage somewhat. Although to trigger PIP coverage the automobile must provide more than merely the setting for the accident, no amendment has changed the requirement that the Act be liberally construed to give the broadest application consistent with its language. The guiding principle remains intact: to accommodate the public interest behind the Act, courts must favor the insured and find coverage if possible.

Illustrative of the application of that guiding principle is the broad meaning that courts have ascribed to the term "accident" as used in section four. In *Pennsylvania National, supra,* the Appellate Division ruled that under PIP claims, "whether an event constitutes an 'accident' must be determined from the perspective of the victim," 185 *N.J.Super.* at 188, 447 *A.2d* 1344, and therefore "accident" may, for PIP purposes, include the results of intentionally-inflicted injury. *Id.* at 187, 447 *A.2d* 1344. In that respect PIP coverage differs from both automobile-liability and uninsured-motorist coverage, neither of which applies to injuries caused by an act that is an accident from the victim's perspective but that is intended by the actor. As the court explained in *Cerullo v. Allstate Insurance Co.,* 236 *N.J.Super.* 372, 565 *A.2d* 1125 (App. Div.1989), the differences between PIP and uninsured-motorist coverages are traceable to the significantly different needs that each coverage satisfies. See *id.* at 375–77, 565 *A.2d* 1125. (To the extent that *Sciascia v. American Insurance Co.,* 183 *N.J.Super.* 352, 443 *A.2d* 1118 (Law Div.1982), *aff'd o.b.,* 189 *N.J.Super.* 236, 459 *A.2d* 1198 (App.Div.1983), on which defendant relies, rests on the notion that for uninsured-motorist-coverage questions courts must determine the issue of whether an accident occurred from

the perspective of the covered victim rather than from that of the uninsured tortfeasor, that case is no longer respectable authority.)

In determining whether the facts reveal a substantial nexus between the accident and the use of an automobile, we apply the test developed in the liability-coverage context in *Westchester Fire, supra*, 126 *N.J.Super.* 29, 312 *A*.2d 664, which held that the

> inquiry should be whether the negligent act which caused the injury, although not foreseen or expected, was in the contemplation of the parties to the insurance contract a natural and reasonable incident or consequence of the use of the automobile, and thus a risk against which they might reasonably expect those insured under the policy would be protected.
>
> [*Id.* at 38, 312 *A*.2d 664.]

*See generally* Cynthia M. Craig & Daniel J. Pomeroy, *New Jersey Auto Insurance Law* § 6.2–3b (1995) (discussing nexus requirement). (As we have pointed out, unlike liability coverage, PIP protection extends to intentional acts. Therefore, when applying the substantial-nexus test to PIP coverage, courts do not require that the injury-producing act have been one of negligence.) The act causing the injury need not be actually foreseen but it must be both a reasonable consequence of the use of an automobile and one against which the parties would expect protection. *Smaul, supra*, 108 *N.J.* at 478, 530 *A*.2d 1251 (finding assault not uncommon and therefore foreseeable); *Kordell v. Allstate Ins. Co.*, 230 *N.J.Super.* 505, 509, 554 *A*.2d 1 (App.Div.) (finding no coverage where insured died of "natural processes unrelated to [his] presence in [his] automobile"), *certif. denied*, 117 *N.J.* 43, 563 *A*.2d 813 (1989); *Foss v. Estate of Cignarella*, 196 *N.J.Super.* 378, 382, 482 *A*.2d 954 (Law Div.1984) (finding no coverage where liability carrier's insured left his vehicle and stabbed plaintiff).

Courts favor insureds' expectations by affording coverage when any fair interpretation will allow. *See Westchester, supra*, 126 *N.J.Super.* at 36, 39, 312 *A*.2d 664. "Objectively reasonable" expectations "may govern even in the absence of ambiguity, in recognition of the generally one-sided nature of insurance contracts." *Clegg v. Cigna Ins. Co.*, 254 *N.J.Super.* 634, 639, 604 *A*.2d 179 (App.Div.1992) (applying underinsured-motorist coverage to

named insured before prorating benefits to passenger to effect named insured's objectively-reasonable expectations concerning first-party coverage). The test does not require direct or proximate cause. *Smaul, supra,* 108 *N.J.* at 477, 530 *A.*2d 1251. Thus, an assault that results from an insured asking for directions while remaining in the car, under circumstances in which the assailants intended to steal the car, created a "direct involvement" between the assault and the use of the car that satisfied the test. *Id.* at 478, 530 *A.*2d 1251.

Accidents that do not arise out of the use of an automobile or are not of the type that are within the contemplation of the parties do not fulfill the test's requirements. For example, the Appellate Division has ruled that in a case in which a decedent voluntarily alighted from the insured car and was fatally stabbed, the stabbing did not occur while decedent was " 'occupying, entering into, alighting from or using an automobile,' " and thus it denied PIP benefits. *Vasil, supra,* 238 *N.J.Super.* at 577, 570 *A.*2d 464 (quoting section four). The court held that "a verbal or physical confrontation with the occupants of another vehicle is not part of the normal use of an automobile." *Ibid.* Similarly, the Appellate Division has ruled that the fact that a victim of a fatal shooting was sitting in her car at the time of the killing did not by itself provide a nexus sufficient to support PIP coverage. *Morgan v. Prudential Ins. Co.,* 242 *N.J.Super.* 638, 642, 577 *A.*2d 1300 (App.Div.), *certif. denied,* 122 *N.J.* 370, 585 *A.*2d 377 (1990). The intention of thieves to steal decedent's car when they shot him while he used a public telephone also failed to create the necessary connection. *Uzcatequi–Gaymon v. New Jersey Mfrs. Ins. Co.,* 193 *N.J.Super.* 71, 73, 472 *A.*2d 163 (App.Div.1984).

IV

Applying the foregoing principles to the facts before us, we are satisfied that the random shooting that caused Kurt's gunshot injuries was clearly an "accident" within the contemplation of

section four. From plaintiff's perspective, the shooting was unintentional. See discussion *supra* at 249, 649 *A.*2d at 1276.

Although defendant acknowledges in its Appellate Division brief that "[i]t is true, as argued by plaintiff, that Mr. Lindstrom was [wounded] 'by an object propelled from an automobile,' which tracks the statutory language," that language may not provide a complete answer to the contention that the shot can be perceived as having been propelled from a shotgun rather than from the car. According to the Appellate Division, "The gunman could just as well have been on foot, or on a motorcycle or a bicycle." 269 *N.J.Super.* at 344, 635 *A.*2d 559. That circumstance, according to the court below, "attenuates the connection between the automobile and the injury." *Ibid.*

We disagree. In our view the automobile did more than provide a setting or an enhanced opportunity for the assault. In addition to allowing the assailant to be at the place of attack, it furnished the assailant with what he must have assumed would be both anonymity and a means of escape. The assailant would not likely have committed such an act of apparently random violence without the use of a car.

In respect of the "foreseeability" question, we ruled in *Smaul, supra,* that assaults on drivers related to the use of automobiles were foreseeable and that the vehicle was "central" to the assault. 108 *N.J.* at 478, 530 *A.*2d 1251. We are satisfied that *Smaul* controls on that issue: Kurt's injury was foreseeable. This case is thus distinguishable from *Vasil, supra,* 238 *N.J.Super.* 572, 570 *A.*2d 464, in which the assault occurred after the decedent had left his car for a purpose not related to "the forward progress of the vehicle." *Vicari, supra,* 174 *N.J.Super.* at 468, 416 *A.*2d 977 (finding PIP coverage for death of insured during attempt to clear accident blocking road).

Perhaps more to the point, however, is the depressing reality that in recent years, unlike 1973 when *Westchester Fire* was decided, drive-by shootings have become an increasingly-common part of the American experience. Regrettably, a court can no

longer say with any certainty that such occurrences are so removed from the American scene as not to be foreseeable.

Finally, we limit today's holding to random, drive-by shootings. We do not purport to rule on cases that present circumstances that intervene between the use of the vehicle and the shooting. As in *Smaul, supra,* "we see no reason rooted in either public policy or statutory interpretation why the fact that a criminal act was involved in the accident should deprive this plaintiff of PIP benefits," 108 *N.J.* at 478–79, 530 *A.*2d 1251; but we recognize as well that section four, however broad its protection for injuries substantially related to the use of an automobile, was not designed to function as general crime insurance.

## V

Judgment reversed.

POLLOCK, J., dissenting.

If courts could extend personal-injury-protection (PIP) benefits without regard to the intent of the Legislature, I might join the majority opinion. Likewise, I would be tempted to join the majority if courts were free to shift the risk of loss from a gravely injured plaintiff to an insurer and its policyholders. Believing that it enjoys that freedom, the majority extends PIP benefits to victims of random, drive-by shootings, notwithstanding its acknowledgment that *N.J.S.A.* 39:6–4 "was not designed to function as general crime insurance." *Ante* at 253, 649 *A.*2d at 1277. I respectfully dissent.

My disagreement with the majority arises from its conclusion that because the bullet that injured plaintiff was "an object . . . propelled . . . from an automobile," *L.*1988, *c.* 119, § 3 (codified at *N.J.S.A.* 39:6A–4), plaintiff's medical expenses are covered PIP benefits. Only by ignoring the inescapable fact that the bullet was propelled from a gun can the majority sustain its conclusion. Presumably, the majority believes that the shooting occurred while the assailant was sitting inside an automobile. Would the majority reach the same result if the assailant had fired the gun

while holding it outside the automobile? If he had temporarily stepped outside the automobile, leaned the gun against it, and fired? Or if he had shot while momentarily outside the vehicle? If so, how long need the assailant be outside the automobile before an injured party may be denied PIP benefits from his or her own insurer? From my perspective, the Legislature never intended PIP benefits to extend to any of those situations or, more importantly, to the present case.

As the majority acknowledges, the Legislature intended to provide PIP benefits for injuries either caused by an automobile or that were "a reasonable consequence of the use of an automobile and one against which the parties would expect protection." *Ante* at 250, 649 *A.*2d at 1276. I doubt that the Legislature ever intended for injured parties to recover PIP benefits when the automobile was merely an attending circumstance. Nor do I believe that reasonably objective insureds believe that their PIP benefits cover random, drive-by shootings.

The majority, however, believes that it can fit such shootings by strangers into the statutory language. Relying on *Sheeran v. Nationwide Mutual Insurance Co.*, 80 *N.J.* 548, 556, 404 *A.*2d 625 (1979) (quoting *Sears, Roebuck & Co. v. United States*, 504 *F.*2d 1400, 1402 (C.C.P.A.1974)), it argues that "where the Legislature has 'made a choice of language [that] fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators.'" *Ante* at 248, 649 *A.*2d at 1275. For the majority, the words of the statute are both the means and the end of statutory interpretation. To this extent, the majority permits statutory language to trump legislative purpose.

Judge Learned Hand, however, once warned: "There is no surer way to misread any document than to read it literally...." *Guiseppi v. Walling*, 144 *F.*2d 608, 624 (2d Cir.1944) (Hand, J., concurring), *aff'd sub. nom. Gemsco, Inc. v. Walling*, 324 *U.S.* 244, 65 *S.Ct.* 605, 89 *L.Ed.* 921 (1945). He realized that the art of statutory interpretation is "the art of proliferating a purpose." *Brooklyn Natural Corp. v. Commissioner of Internal Revenue,*

157 *F.*2d 450, 451 (2d Cir.), *cert. denied,* 329 *U.S.* 733, 67 *S.Ct.* 96, 91 *L.Ed.* 634 (1946).

Similarly, United States Supreme Court Justice Felix Frankfurter realized that "[s]tatutes ... are not inert exercises in literary composition. They are instruments of government, and in construing them 'the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down.'" *United States v. Shirey,* 359 U.S. 255, 260–61, 79 *S.Ct.* 746, 749, 3 *L.Ed.*2d 789, 793 (1959) (quoting *United States v. Whitridge,* 197 *U.S.* 135, 143, 25 *S.Ct.* 406, 408, 49 *L.Ed.* 696, 698 (1905)).

Our own jurisprudence has consistently emphasized that legislative intent, if clearly discernible, should prevail over the plain language of a statute. We recently explained: "In the interpretation of a statute our overriding goal has consistently been to determine the Legislature's intent in enacting a statute." *Roig v. Kelsey,* 135 *N.J.* 500, 515, 641 *A.*2d 248 (1994); *see also City of Newark v. United States,* 254 *F.*2d 93, 97 (3d Cir.1958) (stating that intention of lawmakers is paramount in determining meaning of statute); *Safeway Trails, Inc. v. Furman,* 41 *N.J.* 467, 477, 197 *A.*2d 366 (holding that Court's duty in construing statute is to determine legislative intention), *appeal dismissed and cert. denied,* 379 *U.S.* 14, 85 *S.Ct.* 144, 13 *L.Ed.*2d 84 (1964); *State v. Carlos,* 187 *N.J.Super.* 406, 414, 455 *A.*2d 89 (App.Div.1982) (holding that judicial goal in statutory construction is to effectuate legislative intent); *Borough of Highlands v. Davis,* 124 *N.J.Super.* 217, 222, 305 *A.*2d 814 (Law Div.1973) (stating that rules of statutory construction should be subordinated to ultimate goal of carrying out wishes of Legislature).

Thus, we have emphasized that "[s]tatutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good discretion.'" *Schierstead v. Brigantine,* 29 *N.J.* 220, 230, 148 *A.*2d 591 (1959) (quoting *Morris Canal & Banking Co. v. Central R.R. Co.,* 16 *N.J.Eq.* 419, 428 (Ch.Div.1863)). We have explained that "[i]t is

not the words but the internal sense of the law that controls." *Wollen v. Fort Lee,* 27 *N.J.* 408, 418, 142 *A.*2d 881 (1958).

Like the majority, I believe that the appropriate test under *N.J.S.A.* 39:6A–4 is whether a substantial nexus exists between plaintiff's injuries and the assailant's use of an automobile. *Ante* at 246, 250, 649 *A.*2d at 1274, 1276. Unlike the majority, however, but like the Law Division and the Appellate Division, I find that the nexus between the two events is not substantial.

Contrary to the majority opinion, I respectfully submit that the substantial-nexus test does not support the conclusion that the automobile was "central" to the assault on the hypothesis that "[it] furnished the assailant with ... both anonymity and a means of escape." *Ante* at 252, 649 *A.*2d at 1277. Under the majority's reasoning, the victim of any assault could recover PIP benefits as long as the assailant used a motor vehicle to escape or conceal his or her identity. Although the Legislature conceivably could write a statute that affords such coverage, I believe that it has not done so.

Central to the majority's result is the unsupported characterization of drive-by shootings as "an increasingly-common part of the American experience." *Ante* at 252, 649 *A.*2d at 1277. Whatever truth lies in that characterization is unsupported by any statistics or other authority. A drive-by shooting, "[like] a verbal or physical confrontation with the occupants of another vehicle[,] is not part of the normal use of an automobile." *Vasil v. Zullo,* 238 *N.J.Super.* 572, 577, 570 *A.*2d 464 (App.Div.1990). In light of the undisputed fact that plaintiff's injuries were caused by a bullet from a gun, I would find that the relationship between those injuries and the assailant's automobile is so attenuated that it fails the substantial-nexus test.

I would affirm.

Justices O'HERN and GARIBALDI join in this dissent.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER and STEIN—4.

*For affirmance*—Justices POLLOCK, O'HERN and GARIBALDI—3.