787 A.2d 268 (2002)
346 N.J. Super. 219
Mark S. SHAW, Plaintiff-Appellant,
v.
CITY OF JERSEY CITY, a municipal corporation of the State of New Jersey; John Doe A (fictitious name for the driver of the Jeep Cherokee Motor vehicle); Eliopoulos Konstanti; Michele Cascetta; Elizabeth E. Randall, Commissioner of Insurance on behalf of the Unsatisfied Claim and Judgment Fund Board, Defendants, and
New Jersey Manufacturers Insurance Company, Defendant-Respondent.
New Jersey Manufacturers Insurance Company, Plaintiff Respondent,
v.
Mark S. Shaw, Defendant Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 2001.
Decided January 3, 2002.
*270 John Molinari, Chatham, argued the cause for appellant (Blume, Goldfaden, Berkowitz, Donnelly, Fried and Forte, attorneys; Joseph P. Perfilio, on the brief).
Daniel J. Pomeroy, Springfield, argued the cause for respondent (Mortenson and Pomeroy, attorneys; Mr. Pomeroy and Karen E. Heller, on the brief).
Before Judges STERN, COLLESTER and LINTNER.
*269 The opinion of the court was delivered by LINTNER, J.A.D.
Plaintiff, Mark Shaw,[1] an undercover police officer employed by the City of Jersey City (the City), was injured on the job when he was struck by a vehicle which had been stolen. He filed a verified complaint against the City for Uninsured Motorist coverage (UM) and an order to show cause seeking to require Jersey City to appoint a UM arbitrator. The complaint also sought recovery from the owners of the vehicle and the Unsatisfied Claim and Judgment Fund (UCJF).[2] In a subsequent separate declaratory judgment action, New Jersey Manufacturers Insurance Company (NJM) sought a determination that it was not obligated to provide coverage under a policy of insurance issued to Shaw covering his personal automobile and providing UM benefits. Following the consolidation of both actions, a bench trial was held before Judge Gallipoli based, in part, upon stipulated facts. Judge Gallipoli found that UM coverage was not triggered because the event giving rise to plaintiff's injuries was not an accident.
The central issue raised in this appeal is whose perspective, the tortfeasor's or the insured victim's, must be used in determining whether an "accident" involving a motor vehicle occurred for the purposes of affording coverage under UM insurance. We hold that the language found in Lindstrom v. Hanover Insurance Company, 138 N.J. 242, 249, 649 A.2d 1272 (1994), is controlling and Judge Gallipoli correctly concluded that the determination of whether an accident occurred must be viewed from the standpoint of the tortfeasor to trigger UM coverage. We also *271 overrule Gregory v. Allstate Insurance Company, 315 N.J.Super. 78, 716 A.2d 573 (Law Div.1997), and hold that, absent an express provision in an insurance policy to the contrary, UM protection does not extend to injuries resulting from the intentional use of an uninsured vehicle as an instrument of harm. Accordingly, we affirm.
The parties stipulated that plaintiff was in the course of his employment when he was involved in an incident arising from the use of an uninsured vehicle causing him to sustain a trimalleolar fracture of the left ankle. They further stipulated that plaintiff's damages were in excess of NJM's $35,000 policy limits; that, as between the City and NJM, NJM had the greater policy limits; and that any judgment entered in favor of plaintiff would be equal to the greater of the two policy limits. As a result, both NJM and the City agreed to its respective pro-rata share in the event of a judgment in favor of plaintiff.[3]
The facts are not substantially in dispute. Plaintiff was the only witness to testify. On March 18, 1997, at approximately 12:30 a.m., plaintiff and his partner, Officer Edwin Nazario, were on plain-clothes patrol, looking for stolen vehicles. At the time, they occupied a parked, unmarked van when they observed a Jeep and Honda traveling south on Jersey Avenue at excessively high rates of speed. Realizing that the vehicles were heading toward a dark secluded area at the end of a dead-end street frequented by people who strip cars, they proceeded to a point near the dead end and parked. They waited a short time. When neither of the two vehicles came out, plaintiff exited the van and began to walk toward the location where the vehicles had traveled. He was halfway to the dead end when he saw the Jeep moving toward him. When he realized that the Jeep was "coming right at [him]," he drew his gun. The headlights were illuminated on the Jeep and it was traveling in excess of forty miles per hour. Plaintiff was wearing his badge on a chain around his neck. The Jeep continued to move toward him and, just at the moment that it would have made direct contact with him, he jumped to the left and the Jeep swerved to the right.
The Jeep hit his left leg. He acknowledged that the only reason that he had not been killed was because they both went in different directions. He further admitted that the police report of the incident failed to mention that the vehicle swerved out of the way. He conceded that it appeared to him to be a deliberate act. However, plaintiff did not believe that the driver intentionally tried to hit him but instead was attempting to get away with the stolen vehicle. Although he could see the driver's face as the incident unfolded, the driver was never found nor identified.
Judge Gallipoli found from plaintiff's testimony and the narrative of the events contained in the police report that plaintiff's injuries were caused by the "clearly intentional conduct of the uninsured tortfeasor who tried to run [plaintiff] down so as to escape arrest." He concluded, therefore, that plaintiff's injuries were not caused by an "accident," when viewed from the standpoint of the uninsured driver, but rather from the driver's intentional acts. Finding no accident, the judge found that UM coverage was not triggered, and entered judgment in favor of defendants, dismissing plaintiff's complaint.
*272 Plaintiff essentially argues that he was involved in an accident under the terms of his UM insurance policy. He argues that the primary purpose of UM coverage is to replace claims that would have been made against the UCJF and that our case law supports the view that intentional torts which arise from the use of a motor vehicle are accidents under the terms of UM policies. We disagree.

I
We first consider plaintiff's claim that our decision in Kenny v. New Jersey Manufacturers Ins. Co., 328 N.J.Super. 403, 408, 746 A.2d 57 (App.Div.2000) and the opinion in Proskurnja v. Elder, 73 N.J.Super. 466, 476, 180 A.2d 200 (Law Div.1962), when read together, stand for the proposition that the statutory provisions establishing mandatory UM coverage are intended to provide the same remedial scope as found in the provisions creating the UCJF.
We begin our analysis with the provisions of N.J.S.A. 17:28-1.1, mandating UM coverage.
a. No motor vehicle liability policy ... shall be issued ... unless it includes coverage in limits for bodily injury or death as follows: ... for payment of all or part of the sums which the insured or his legal representative shall be legally entitled to recover as damages from the operator or owner of an uninsured motor vehicle, or hit and run motor vehicle, as defined in section 18 of P.L.1952, c. 174 (C. 39:6-78), because of bodily injury... sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured or hit and run motor vehicle.... (Emphasis added).

[N.J.S.A. 17:28-1.1a]
N.J.S.A. 39:6-78, which establishes a person's right to proceed against the UCJF when injured by a hit-and-run or uninsured vehicle, is not limited in scope to injuries caused by an "accident." Furthermore, it precludes any person who is "the owner or registrant of an uninsured motor vehicle" from asserting a claim, as well as those who are properly covered. N.J.S.A. 39:6-78(c); N.J.S.A. 39:6-62. It was recognized in Proskurnja, supra, 73 N.J.Super. at 476, 180 A.2d 200, that the statutory definition of a qualified person entitled to seek benefits from the UCJF did not limit recovery based upon the nature of conduct of the uninsured operator. Instead, the statute expressly provides that any "person, who suffers damages resulting from bodily injury ... arising out of the ownership, maintenance or use of a motor vehicle in this State," may qualify. N.J.S.A. 39:6-65.
The word "accident," which appears by way of limitation in the statutory provision defining the scope of mandatory UM coverage, does not appear in the statutory provision that creates the remedial scope of the UCJF. Although the statute creating mandatory UM coverage (N.J.S.A. 17:28-1.1) mirrored the claim-eligibility requirements for proceeding against the UCJF for a hit-and-run occurrence (N.J.S.A. 39:8-78), both statutes are subject to distinct and separate remedial scopes. Kenny, supra, 328 N.J.Super. at 408, 746 A.2d 57 (holding that because the UM statute incorporates the hit-and-run definition of the UCJF, its claim-eligibility requirements should not be read more restrictively than its analogous UCJF counterpart). The remedial scope intended by the Legislature for UCJF claims is not identical to that envisioned for UM coverage. The statutory protection mandating UM coverage provides a remedy for those who carry or are required to carry mandatory automobile insurance, while the statutory protection afforded by the UCJF *273 serves those who are not required to be so covered and have no other source of compensation. Proskurnja, supra, at 473-74, 180 A.2d 200; N.J.S.A. 39:6-62. Unlike the claims against the UCJF, claims for which UM coverage applies are limited to those arising from accidental injury or damage. Plaintiff's contentions to the contrary are misplaced.

II
We move on to consider plaintiff's contention that the term "accident," as used in the context of establishing the existence of UM coverage, must be viewed from the standpoint of the insured. NJM concedes that the facts here establish a substantial nexus between the accident and the use of an uninsured vehicle. It maintains, however, that the term "accident" must be viewed from the perspective of the tortfeasor, not the insured, and does not include intentional conduct.
Lindstrom, supra, 138 N.J. 242, 649 A.2d 1272, held that a random, drive-by shooting that caused gunshot injuries to a member of a crowd had a sufficient nexus to the operation of a motor vehicle and was an accident within the meaning of the statutory scheme creating PIP benefits, which mandated coverage for intentional wrongdoing. Justice Clifford, writing for the majority in Lindstrom, expressly adopted our reasoning in Cerullo v. Allstate Ins. Co., 236 N.J.Super. 372, 375-77, 565 A.2d 1125 (App.Div.1989) and Pennsylvania National Mutual Casualty Ins. Co. v. Estate of Miller, 185 N.J.Super. 183, 188, 447 A.2d 1344 (App.Div.1982), concerning the different needs satisfied by PIP and UM coverage and the applicability of the term "accident." Lindstrom, supra, 138 N.J. at 249-50, 649 A.2d 1272. Although there is a "superficial similarity" in the use of the term "accident" in statutory authority mandating both PIP (N.J.S.A. 39:6A-4) and UM (N.J.S.A. 17:28-1.1) coverages, we recognized in Cerullo that the function and purpose of each coverage is significantly different, transcending any similarities in language.
UM coverage requires an injury "arising out of the ownership, maintenance, or use" of the uninsured vehicle. Benefits are available only if the covered party, the plaintiff in this case, establishes that he is "legally entitled to recover damages from the operator or owner" of the uninsured or hit and run vehicle. PIP benefits, on the other hand, more closely resemble accident, disability and medical coverages in which fault is irrelevant. This distinction is significant because UM coverage is mandated as a substitute for the liability insurance which should have been covering the uninsured vehicle.

[Cerullo, supra, 236 N.J.Super. at 375, 565 A.2d 1125 (citations omitted).]
Justice Clifford noted that "[i]n Pennsylvania National [we] ruled that under PIP claims, `whether an event constitutes an accident must be determined from the perspective of the victim.'" Lindstrom, supra, 138 N.J. at 249, 649 A.2d 1272 (citation omitted). Applying the different purposes and needs, Justice Clifford distinguished UM coverage from that afforded by PIP:
PIP coverage differs from both automobile-liability and uninsured-motorist coverage, neither of which applies to injuries caused by an act that is an accident from the victim's perspective but that is intended by the actor. (Emphasis added).

[Ibid.]
Lindstrom expressly overruled Sciascia v. American Ins. Co., 183 N.J.Super. 352, 443 A.2d 1118 (Law Div.1982), aff'd o.b., 189 N.J.Super. 236, 459 A.2d 1198 (App. Div.1983), to the extent it held that the *274 determination of an accident, in the context of UM coverage, must be viewed from the perspective of the covered victim rather than that of the uninsured tortfeasor.
Justice Clifford, writing for the Court eight years earlier in Allstate Ins. Co. v. Malec, 104 N.J. 1, 10, 514 A.2d 832 (1986), which validated a specific exclusion against liability for intentional wrongful acts in an automobile liability policy as not being violative of either public policy or the No Fault Act, recognized that the decisions pertaining to first-party PIP coverage do not purport to apply to liability coverage designed to protect an insured and that "`all or virtually all' of the policies written for [liability coverage] contain exclusions... for harm intentionally caused by the insured." Id. at 11, 514 A.2d 832.
Two opinions decided after Lindstrom, Abraham v. Raso, 183 F.3d 279 (3rd Cir. 1999) and Gregory, supra, 315 N.J.Super. 78, 716 A.2d 573, depart from Lindstrom and hold that UM coverage must be determined by viewing the circumstances from the perspective of the insured victim. The Third Circuit rejected Lindstrom as "ill-considered [dicta], poorly supported and... [not] accurately reflect[ing] the position of the New Jersey Supreme Court." Abraham, supra, 183 F.3d at 298. In reaching its determination that UM coverage should be viewed from the perspective of the insured victim, the Third Circuit relied on Lindstrom's failure to mention Malec.
The discussion in Malec relied on by the Third Circuit concerned the exception to the general public policy prohibiting an insured from obtaining insurance that provides indemnity against the civil consequences of the insured's own intentional wrongful acts. See Ambassador Ins. Co. v. Montes, 76 N.J. 477, 388 A.2d 603 (1978) (holding coverage indemnifying for intentional wrong was valid where the policy provided (1) coverage on its face; (2) no exclusionary language; (3) payment under the policy would protect innocent third persons without benefitting wrongdoer; and (4) insurer could subrogate against wrongdoer). The Third Circuit concluded that, if revisited, our Supreme Court would not follow its own dicta in Lindstrom, reasoning that, unlike liability insurance, UM coverage does not encourage the insured to commit an intentional wrong, but instead protects an otherwise blameless and surprised insured against the acts of a third person. We agree with the Third Circuit's conclusion that the public policy bar against insuring oneself for intentional wrongful conduct does not apply to UM coverage and that, therefore, an insurer can offer, if it desires, express coverage for injuries to an innocent insured resulting from the intentional wrong of a third-party uninsured tortfeasor. However, we do not agree that our Supreme Court would utilize that reasoning to disavow what it subsequently said in Lindstrom concerning the perspective from which UM coverage must be viewed.
A determination by the Third Circuit Court as to what law would be followed by the New Jersey Supreme Court is not binding on us. See Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 80, 577 A.2d 1239 (1990); Small v. Department of Corrections, 243 N.J.Super. 439, 444, 579 A.2d 1263 (App.Div.1990). As an intermediate court we are bound to the Supreme Court's carefully considered dictum in the same manner as if it were an outright holding. Barreiro v. Morais, 318 N.J.Super. 461, 468-69, 723 A.2d 1244 (App.Div.1999). We note that in Malec, supra, 104 N.J. at 10, 514 A.2d 832, Justice Clifford made it clear, as he did in Lindstrom, that our decision in Pennsylvania National, finding benefits were afforded for intentional occurrences, pertained *275 "only to first-party PIP coverage." Furthermore, Malec recognized that Ambassador was decided by a sharply divided Court and, therefore, gave it a "narrow" reading relating it only to the specific circumstances presented. Malec, supra, 104 N.J. at 12-13, 514 A.2d 832. We are bound by the dictum in Lindstrom, notwithstanding the Third Circuit's conclusions to the contrary.

III
We next focus on plaintiff's contention that the statutory scheme establishing UM benefits mandates coverage for injuries to an insured resulting from an intentional collision by an uninsured motorist. Two months prior to the decision in Lindstrom, a published Law Division opinion in Continental Ins. Co. v. Miller, 280 N.J.Super. 85, 654 A.2d 514 (Law Div.1994), held that UM coverage is available to an insured who is injured by an uninsured motorist's intentional use of an automobile as an instrument of harm. In Continental, a stolen vehicle driven by an uninsured motorist intentionally went across the centerline of a highway, striking and injuring two police officers occupying an insured vehicle. Similarly, in Gregory, supra, 315 N.J.Super. 78, 716 A.2d 573, the defendant, driver of an uninsured vehicle, intentionally struck plaintiff's vehicle in the rear. Judge Menza concluded in Gregory that the reference in Lindstrom that UM coverage applies to an accident as viewed from the actor's perspective was confined to the factual circumstances found in Cerullo. In Cerullo, the defendant, driver of an unidentified motor vehicle, cut plaintiff's vehicle off. At the next intersection, while both vehicles were stopped, a passenger emerged from the unidentified vehicle, approached plaintiff's window and punched plaintiff, causing a serious eye injury. Judge Menza determined that Lindstrom's adoption of the reasoning in Cerullo, like its specific rejection of the holding in Sciascia, was confined to circumstances where the insured's injuries resulted from a direct physical assault by a third person. He therefore concluded that an intentional collision with an automobile resulting in injuries to an insured was to be viewed from the perspective of the insured, instead of from the perspective of the actor, when determining UM coverage.
Our expression of agreement in Cerullo with the holding in Sciascia specifically dealt with its conclusion that death caused by a gunshot fired from a moving automobile did not provide a sufficient nexus to trigger UM coverage. We held that there was no UM coverage because the accident did not arise out of the use of an automobile. Cerullo, supra, 236 N.J.Super. at 377-78, 565 A.2d 1125. Cerullo did not address that portion of the opinion in Sciascia, later renounced in Lindstrom, concerning from whose perspective, for UM purposes, an accidental injury should be viewed. The distinction we drew in Cerullo between a non-automobile and an automobile instrumentality was limited to our determination that there was not a sufficient nexus to find coverage. Judge Menza mistakenly relied on our opinion in Cerullo to conclude that coverage is dependent on the instrumentality used by an intentional tortfeasor. His conclusion that coverage attaches to assaultive use of an automobile ignores the expressed statement in Lindstrom that neither automobile liability nor uninsured-motorist coverage applies "to injuries caused by ... an act intended by the actor." Lindstrom, supra, 138 N.J. at 249, 649 A.2d 1272. It matters not whether an assault is carried out by striking someone with a motor vehicle, a fist, or a bullet propelled from a gun, all qualify as intentional wrongdoing.
Applying the rationale in Lindstrom and its adoption of our reasoning in *276 Cerullo and Pennsylvania National, we are convinced that UM benefits are to be treated significantly different from PIP coverage, even though both are directly paid for by the insured as first-party coverage. Because UM benefits replace liability insurance, which is otherwise mandated but not carried by a third-party tortfeasor, the determination of whether an event constitutes an "accident," as prescribed by N.J.S.A. 17:28-1.1a, must be made from the perspective of the tortfeasor rather than the insured victim. See Grabowski v. Liberty Mutual Ins. Co., 345 N.J.Super. 241, 244, 784 A.2d 754 (2001). It is the third-party tortfeasor's conduct which is determinative of whether UM benefits are to be paid. Unlike PIP, UM coverage affords benefits akin to those provided by liability insurance. The term "accident," when viewed in the context of liability coverage, does not afford protection for intentional harm. Therefore, absent an express provision in a policy to the contrary, UM protection does not extend to injuries resulting from the intentional acts of the tortfeasor, no matter what instrumentality is used.

IV
At oral argument, plaintiff asserted for the first time that there was insufficient credible evidence to establish that the hit-and-run driver intended to use the stolen vehicle that he was driving to injure plaintiff. Ordinarily, we need not consider an issue not briefed before us. A. Makray, Inc. v. McCullough, 103 N.J.L. 346, 348, 135 A. 815 (E & A 1927); Emmis Broadcasting Corp. of N.Y. v. Borough of East Rutherford, 16 N.J. Tax 29, 39 (App. Div.1996), Ferraro v. Demetrakis, 167 N.J.Super. 429, 431-432, 400 A.2d 1227 (App.Div.), certif. denied, 81 N.J. 290, 405 A.2d 834 (1979). We, nevertheless, address the issue as it was raised before the trial judge. Generally, we must defer to a trial court's fact-findings when the evidence is largely testimonial and involves questions of credibility. We are not permitted to disturb a finding which "could reasonably have been reached on sufficient credible evidence presented in the record," considering the proofs as a whole. State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999). We may only interfere when a trial court's fact-findings would work an injustice. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974). Consequently, "an appellate court should exercise its original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter." Id. at 484, 323 A.2d 495. The same level of deference is not required when we are reviewing a legal conclusion. Manalapan Realty v. Township Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995). Applying these principles, we are satisfied from our review of the evidence that Judge Gallipoli's finding, that plaintiff's injuries were caused by intentional conduct when an uninsured hit-and-run driver tried to run him down in order to effectuate his escape, is unassailable.
Affirmed.
NOTES
[1] We refer to Shaw as "plaintiff" even though he was also named as a defendant in a subsequently filed consolidated declaratory judgment action brought by his Uninsured Motorist insurer.
[2] The complaint against the owners of the vehicle was ultimately dismissed by plaintiff due to a valid disclaimer by the owners' liability insurance company because the vehicle had been stolen, thereby triggering plaintiff's UM insurance and necessitating the dismissal of the complaint against the UCJF.
[3] The City, which was self-insured and had minimum $15,000 UM coverage, would be responsible for 15/50 (3/10) of $35,000, while NJM's obligation would be 35/50 (7/10) of its policy limits.