842 A.2d 247

HASSANNAH BOWE, PLAINTIFF–APPELLANT, v. NEW JERSEY
MANUFACTURERS INSURANCE COMPANY, DEFENDANT–
RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 8, 2003—Decided February 24, 2004.

130

Before Judges WEFING, COLLESTER and FUENTES.

*Norman Costanza* argued the cause for appellant (*Sellinger & Sellinger*, attorneys; *Larry M. Pollack*, on the brief).

*Gregory E. Peterson* argued the cause for respondent (*Connell Foley*, attorneys; *Brian G. Steller*, of counsel; *Mr. Peterson* on the brief).

The opinion of the court was delivered by

FUENTES, J.A.D.

■ In this appeal we are asked to decide whether a plaintiff seeking Personal Injury Protection (PIP) benefits under *N.J.S.A.* 39:6A–4 must prove that the treatment she received was causally related to a particular automobile accident when the insurer asserts a pre-existing injury or condition as a defense. We hold that a plaintiff seeking PIP benefits must prove, by a preponderance of the evidence, that the treatment for which she seeks reimbursement was proximately caused by the particular automobile accident triggering coverage under her insurance policy. Once that causal link is established, the PIP carrier is liable for the cost of the post-accident treatment, up to the coverage limits of the policy.

We gather the following facts from the evidence presented at trial.

I

On February 18, 1997, plaintiff Hassannah Bowe was driving her car on Route 21 when she swerved to avoid hitting another car that had unexpectedly entered her lane of traffic. She managed to maintain control of her vehicle without colliding with any other car or object on the road. In the course of undertaking this defensive maneuver, she claimed to have struck the left side of her head against the driver's side window. After the impact, she complained of headaches and vision problems. No police or emergency medical personnel responded to the scene.

Upon arriving home immediately after the accident, plaintiff's headache and vision problems worsened. Her fiancé recommended that she seek medical treatment. He drove her to the Clara Maass Medical Center emergency room where she was admitted for her head trauma. Plaintiff did not complain of back pain or leg pain. She was hospitalized for several days and was discharged without any reference to a back injury. Plaintiff returned to Clara Maass sometime thereafter, complaining that she "could not see at all." She was referred to the University of Medicine and Dentistry Hospital of New Jersey (UMDNJ) in Newark. There, she consulted with a neurologist and an ophthalmologist concerning her visual problems. Plaintiff's visual complaints were eventually diagnosed as probably due to hysterical blindness, without any apparent organic basis.

Despite an absence of any orthopedic complaints related to the February 1997 accident, six days after the accident, plaintiff visited a chiropractor she had been treating with in connection with a 1995 automobile accident. Plaintiff had last visited this chiropractor the day before the February 1997 accident. Her chief complaint to the chiropractor related to problems with her left arm. The chiropractor referred her to a neurologist. Although plaintiff did not have a complete recollection of the visit, the neurologist's records do not show that plaintiff complained of any pain or problems with her lower back.

On May 2, 1997, the chiropractor made a second referral, this time to a general practitioner whose office was located directly above his own. According to plaintiff, she was suffering from headaches and back pain. This physician's office notes do not reflect any mention of back pain during the initial visit. In July 1997, a magnetic resonance imaging (MRI) study of plaintiff's lumbar spine showed a disc herniation at L4–5. By this time, the general practitioner's office notes show that plaintiff was complaining of pain in her lower back.

When conventional pharmacological treatment proved unsuccessful, the general practitioner referred plaintiff to an anesthesiologist for pain management. This physician administered trigger point injections and also suggested acupuncture. This treatment did not significantly alleviate her symptoms.

In August 1997, plaintiff consulted with another neurologist. She complained of pain in her head, neck and back and a total numbness of her left upper extremity. This physician did not find any objective medical evidence of neurological problems and recommended that plaintiff take Elavil, an antidepressant medication which is also used for pain management.

On November 6, 1997, plaintiff saw Dr. William Vonroth, an orthopedic surgeon to whom she was referred by her attorney. According to Dr. Vonroth's office notes,[1] her "major complaint" at this time was "discomfort in the lower back, cervical region, and the symptoms [caused by] flexion extension." In the patient information intake sheet completed by plaintiff, she indicated the onset of back pain just two weeks prior to her visit. She attributed the pain, however, to the February 18, 1997 accident. Dr. Vonroth gave the following answers when questioned on this issue:

Q. And you accepted that history as accurate?

A. She wrote it on her information sheet, and I would, yes.

---

[1] Although the witness testified at trial, he had no independent recollection of any of the details of the treatment he provided to plaintiff.

Q. Okay. So that was her own representation to you on what would be considered an intake form?

A. Yes. That would be her acute pain, not if she ever had back pain when she was younger, just the fact that this incident brought her to my office. She related to the 2/18/97 accident.

Q. Is that odd to you that there was no onset of back pain for how many months is that? Six months after the accident.

A. No.

 \* \* \* \* \* \* \* \*

Q. Okay. Now do you have any information as to how this accident [February 18, 1997] occurred?

A. No.

Plaintiff continued to treat with Dr. Vonroth until December 4, 1997. The next time she saw Dr. Vonroth was seventeen months later on March 4, 1999. When questioned about this at trial, plaintiff could not offer any explanation for this hiatus. She also could not recall whether she had had any further treatment for back pain during this time period.

On April 9, 1999, plaintiff underwent an MRI study of her lumbar spine at Dr. Vonroth's request. Office records show that plaintiff missed four appointments scheduled to review the results of this study. Plaintiff became pregnant during this time period, but did not give birth until February 2000, approximately two months after the last scheduled appointment. She did not return to see Dr. Vonroth until April 19, 2000.

On November 20, 2000, plaintiff underwent a second MRI study of the lumbar spine because of the poor quality of the April 1999 test. According to Dr. Vonroth, this second MRI showed degenerative disc disease at the L3–4 and L4–5 levels. On January 29, 2001, Dr. Vonroth operated on plaintiff, excising a disc at the L4–5 level. Despite the surgery, plaintiff continued to experience lower back pain. She then consulted with a Dr. Mitchell Reiter who performed spinal fusion surgery in November 2001.[2] Despite

---

[2] Because Dr. Reiter did not appear at trial and otherwise failed to cooperate with plaintiff in this litigation, she is not making a claim for PIP benefits for medical services rendered by this physician.

these two separate surgical interventions, plaintiff continues to experience lower back pain and is unable to work. She currently receives social security disability benefits.[3]

In the course of his direct examination, Dr. Vonroth opined that plaintiff's back surgery was "precipitated" by the February 18, 1997 accident. On cross-examination, defense counsel asked Dr. Vonroth the following questions:

Q. Are you aware that Ms. Bowe had a lumbar spine MRI conducted before this accident?

A. No.

Q. Did you ever review—strike that.

A. No.

Q. Were you ever told—

A. I don't know, maybe. I don't think so, no.

Q. Were you ever told the results of that study?

A. No.

Q. Think that something important that you would want to review in connection with eliciting an opinion as to causal relationship?

A. It would help, yes.

The MRI lumbar study referred to by defense counsel was performed in connection with an automobile accident suffered by plaintiff in 1995. According to the medical records produced by defendant's expert Dr. Jeffrey Frankel, plaintiff began treating with a chiropractor for head, neck, back and chest pain, including pins and needles in her arms and numbness in her fingers, three and one-half weeks after the 1995 accident.

She continued chiropractic treatment until May 22, 1996. This chiropractor eventually referred her to a neurologist. When she saw the neurologist in July 1996, plaintiff complained of pain in her lower back and pain radiating to both lower extremities. An electromyogram (EMG) found "indications of a nerve root problem at the L5–S1 level." Two months before the February 1997

---

[3] In addition to the medical problems discussed herein, plaintiff also had gallbladder surgery in 1998 and suffers from asthma. She was hospitalized during this same time period for inhaling noxious fumes.

accident, plaintiff consulted with a physiatrist complaining of pain in the head, neck and lower and mid-back regions. This doctor recommended lumbar support. Another lumbar MRI study was performed on December 13, 1996. That MRI showed, according to the uncontroverted testimony of Dr. Frankel, the same disc desiccation that appeared in the July 1997 study.

Although obviously relevant to a determination of whether the injuries for which he treated plaintiff were causally linked, in whole or in part, to the February 18, 1997 accident, Dr. Vonroth had not reviewed any of the medical records pertaining to the 1995 accident at the time he offered an opinion on the subject. In fact, Dr. Vonroth gave the following testimony about his knowledge of plaintiff's injuries relative to the 1995 accident:

Q. Ms. Bowe indicated to you that she had injured her back in a prior accident?

A. She said her neck and back, primarily her neck. The back was not a problem, that's why I didn't really have to worry about it, or didn't seem to be. It wasn't a factor—when she said, yes, I hurt my back, I'm being treated, I have a problem. Now I re-injured my back in the accident.

That would have been still a factor if she would have told me that. She never told me that. She just said she had an accident, major part of that accident was her neck and then that's why it wasn't an issue.

Q. Do you know if there was a hospital record relevant to that 1995 accident?

A. I assume there was. I don't have any records. We checked, and there's no records from Clara Maas [sic] or any other hospital.

Q. I'll submit to you I have records from Union Hospital which indicate the patient was taken on a backboard into the emergency room and complained of low back pain.

Does that at all change your opinion with respect to the causal relationship between the services you rendered and the '97 accident?

A. Two years prior to this accident?

Q. Yes, sir.

A. No. · Not of my interpretation of what she told—the patient relationship with a doctor. She didn't make that an issue.

Q. If I told you, she saw a [physiatrist] who diagnosed her with a permanent chronic and intermittent exacerbation and remissions of pain in the neck and low back regions. Would that at all affect your opinion with respect to the causal relationship we're talking about?

A. Only—no, causal relationship is something that precipitates a problem that I had to deal with, and the precipitating reason for her to come to my office was that the incident of the accident of '97. It may have made her more susceptible

probably for her problems, if that was her pre-existing history, but it doesn't change what we had to do, what was caused by what happened.

In this light, Dr. Vonroth could not give an opinion of "what percentage [of plaintiff's injuries were] from a pre-existing condition" caused by the 1995 accident.

At the end of trial, the judge issued a letter opinion holding that plaintiff had failed to prove "a causal connection of the need for surgery to the 1997 accident."

## II

Plaintiff argues here that the trial court incorrectly applied a proximate cause analysis in denying her PIP benefits. Instead, plaintiff maintains that she need only establish a substantial nexus between her injuries and the automobile accident triggering coverage. We disagree.

*N.J.S.A.* 39:6A–4 provides in pertinent part:

Except as provided by [*N.J.S.A.* 39:6A–3.3 and *N.J.S.A.* 39:6A–3.1], every standard automobile liability insurance policy .. shall contain personal injury protection benefits for the payment of benefits without regard to negligence, liability or fault of any kind, to the named insured and members of his family residing in his household who sustain bodily injury *as a result of an accident* while occupying, entering into, alighting from or using an automobile[.]

[Emphasis added.]

We have consistently held that in order *to qualify* for PIP benefits, a plaintiff need only prove a substantial nexus between the injury sustained and the use of the automobile. *Lindstrom v. Hanover Ins. Co.*, 138 *N.J.* 242, 247–53, 649 *A.*2d 1272 (1994); *Negron v. Colonial Penn Ins.*, 358 *N.J.Super.* 59, 62, 816 *A.*2d 1087 (App.Div.2003); *Svenson v. Nat'l Consumer Ins. Co.*, 322 *N.J.Super.* 410, 413, 731 *A.*2d 91 (App.Div.1999); *Smaul v. Irvington Gen. Hosp.*, 209 *N.J.Super.* 592, 595, 508 *A.*2d 1147 (App.Div. 1986), *aff'd*, 108 *N.J.* 474, 530 *A.*2d 1251 (1987). However, no reported decision in this State has ever declared that by the use of the phrase "as a result of an accident" the Legislature intended that there be only a substantial nexus between the injuries sustained and the automobile accident.

■ In deciding this question, we will be guided in our analysis by the remedial purpose of the PIP statute. Public policy requires courts to construe the No Fault Act to effectuate broad protection for accident victims. *New Jersey Mfrs. Ins. Co. v. Hardy*, 178 *N.J.* 327, 332, 840 *A.*2d 231 (2004); *N.J.S.A.* 39:6A–16. However, this rule of interpretation is not a license to disregard clear legislative language in order to relieve plaintiff from her statutory burden of proof. *See Selected Risks Ins. Co. v. Allstate Ins. Co.*, 179 *N.J.Super.* 444, 450, 432 *A.*2d 544 (App.Div.), *certif. denied*, 88 *N.J.* 489, 443 *A.*2d 705 (1981).

■ The phrase "bodily injury *as a result* of an accident" in *N.J.S.A.* 39:6A–4, requires an insured seeking PIP benefits to causally link the medical treatment received to the injuries sustained in a particular accident. This phrase is the functional equivalent of "caused by" or "by reason of," which the Supreme Court has found to be indistinguishable from the concept of proximate cause. *Cruz–Mendez v. ISU/Ins. Servs.*, 156 *N.J.* 556, 575, 722 *A.*2d 515 (1999).

■ In this context, a carrier may assert as a defense to a PIP claim that the treatment for which the insured is seeking benefits is exclusively related to a pre-existing injury or condition. When this defense is raised, the insured has the burden of proving that the treatment at issue is causally linked to either (1) an aggravation of that injury or condition, or (2) a new injury independent of that pre-existing injury or condition. In either case, the treatment must have resulted from the particular automobile accident triggering coverage.

■ In a case alleging an aggravation of a pre-existing injury or condition, a PIP claimant must present objective medical evidence from which a medical professional can form an opinion that the trauma suffered in the particular accident caused the aggravation. This opinion must, at the very least, be based on an evaluation of the medical records of the claimant prior to the particular accident.

Once that causal link is established, a PIP carrier is liable for the cost of the post-accident treatment up to the coverage limits of the policy, even if that treatment addresses, in whole or in part, the pre-existing injury or condition. Thus, in a PIP case, a plaintiff need not prove the percentage of her injury caused by the particular accident triggering coverage. To prevail on a PIP claim, a plaintiff need only prove that her pre-existing injury or condition was aggravated by the accident for which coverage is sought. This interpretation is consistent with the Legislature's intent to provide PIP claimants the broadest possible coverage. *New Jersey Mfrs. Ins. Co. v. Hardy, supra* at 332, 840 *A.2d* 231; *Svenson v. Nat'l Consumer Ins. Co., supra,* 322 *N.J.Super.* at 416, 731 *A.2d* 91.

Like employers in workers' compensation cases, a PIP carrier must take a claimant as it finds her. *See Verge v. County of Morris,* 272 *N.J.Super.* 118, 126, 639 *A.2d* 378 (App.Div.1994) (holding that an employee is not disqualified from workers' compensation benefits under the requirement that the injury arise out of the employment where the pre-existing condition is aggravated, accelerated or combined with the pre-existing disease or infirmity to produce the disability for which compensation is sought). This is so because both the Workers' Compensation Act, *N.J.S.A.* 34:15-1 to -142, and the No Fault Act share the salutary purpose of compensating a class of claimants without regard to fault.

In reaching this conclusion, we distinguish PIP benefit cases brought under *N.J.S.A.* 39:6A-4 from the line of cases which have examined the aggravation of a pre-existing injury or condition in the context of the threshold provisions in *N.J.S.A.* 39:6A-8a. *See Loftus–Smith v. Henry,* 286 *N.J.Super.* 477, 491, 669 *A.2d* 852 (App.Div.1996); *see also Polk v. Daconceicao,* 268 *N.J.Super.* 568, 575, 634 *A.2d* 135 (App.Div.1993).

We also decline to adopt the type of apportionment of damages analysis applicable to causes of action brought under a tort theory of liability. *See Reichert v. Vegholm,* 366 *N.J.Super.* 209, 213–15, 840 *A.2d* 942 (App.Div.2004).

## III

 Here, plaintiff's immediate physical complaints relative to the February 18, 1997 accident were loss of vision and headaches. Six days later, plaintiff's only mention of pain related to her left arm. The neurological referral, made by her chiropractor, did not involve any symptoms to her lower back.

The first documented reference to a lower back injury does not occur until approximately five months after the accident, when an MRI study revealed a disc herniation at L4–5. The first reference to plaintiff's "*major* complaint" of lower back pain does not surface until approximately eight months after the accident, when she commences treatment with Dr. Vonroth.

The history of the treatment provided by Dr. Vonroth, including the disc excision surgery, does not create a factual basis which would support an opinion that the February 18, 1997 accident either aggravated a pre-existing injury or condition, or independently caused an injury to plaintiff's lower back. Dr. Vonroth was not provided with any of the medical records documenting plaintiff's treatment history relative to the 1995 accident, including the December 13, 1996 lumbar MRI study. Without these records, Dr. Vonroth's opinion as to causation was based solely on plaintiff's admittedly incomplete account of her symptoms and prior treatment. Under these circumstances, the trial court correctly found that Dr. Vonroth's opinion lacked evidentiary support.

Plaintiff nevertheless argues that defendant should be equitably estopped from denying coverage. Because this argument was not raised before the trial court, we decline to entertain it here. *Brady v. Dep't of Personnel*, 149 *N.J.* 244, 266, 693 *A.*2d 466 (1997); *Nieder v. Royal Indem. Ins. Co.*, 62 *N.J.* 229, 234, 300 *A.*2d 142 (1973); *Conrad v. Robbi*, 341 *N.J.Super.* 424, 447, 775 *A.*2d 562 (App.Div.) *certif. denied*, 170 *N.J.* 210, 785 *A.*2d 438 (2001).

Affirmed.